Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LARY JAMES PLUMLEE, *Petitioner-Appellant,* v. FRANKIE SUE DEL PAPA; JOHN IGNACIO, *Respondents-Appellees.* | No. 04-15101 D.C. No. CV-00-00244-DWH/VPC ORDER AMENDING OPINION AND DISSENT AND AMENDED OPINION AND AMENDED DISSENT |

Appeal from the United States District Court
for the District of Nevada
David Warner Hagen, District Judge, Presiding

Argued and Submitted
November 2, 2004—San Francisco, California

Filed October 18, 2005
Amended October 11, 2006

Before: Betty B. Fletcher, Sidney R. Thomas, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Bea

17377

## COUNSEL

Jason F. Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the petitioner-appellant.

Victor-Hugo Schulze II, Deputy Attorney General, Las Vegas, Nevada, for the respondent-appellee. With him on the briefs was Joseph W. Long.

## ORDER

The majority opinion and the dissenting opinion filed October 18, 2005, slip op. 14223, appearing at 426 F.3d 1095 (9th Cir. 2005), are hereby amended. The amended opinion and amended dissent are filed concurrently herewith. The opinion and dissent are amended as follows:

1.   Addition of footnote to 426 F.3d at 1107, end of paragraph 2:

Recently, in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006), the Supreme Court reaffirmed that the Sixth

Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice. Writing for the majority, Justice Scalia further held that "erroneous deprivation of the right to counsel of choice" is structural error requiring the reversal of a subsequent conviction. *Id.* at 2564. The Court also explicitly noted that the right to counsel of choice "does not extend" to cases in which defendants "require counsel to be appointed for them." *Id.* at 2565.

Plumlee's claim is different. He was deprived entirely of legal counsel. The deprivation he suffered is different in kind and even greater than that suffered by Gonzalez-Lopez. To be sure, Plumlee claims that he did not want to be represented by his particular attorney. But the constitutional violation was not that he was denied "the right to counsel of [his] choice." *Id.* at 2562. Instead, it was that the justifiable distrust of his attorney became so acute that Plumlee was denied his clearly established Sixth Amendment right to have an attorney "acting in the role of an advocate." *Anders*, 386 U.S. at 743.

(to the Dissent)

2. Addition of footnote to 426 F.3d at 1121, end of last full paragraph on the page:

The majority asserts that the Supreme Court's recent decision in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006) "reaffim[s] that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice." 426 F.3d at 1107 n.8. The majority mischaracterizes the *Gonzalez-Lopez* holding. *Gonzalez-Lopez* did not recognize the right of a criminal defendant to counsel "of his choice" anymore than it recognized the "right" of a shopper to goods "of his choice" in a shop—that is, unless the shopper pays for the goods or convinces the store-keeper to make them a present. The first paragraph of the majority's footnote

would be less liable to be quoted mischievously in the future, were the opinion to survive, if the words "of his choice" carry with them: "so long as he could arrange to pay such counsel, or have such counsel agree to render services without expectation of payment."

## OPINION

B. FLETCHER, Circuit Judge:

Defendant-appellant Lary James Plumlee ("Plumlee"), convicted of murder and armed robbery in Nevada state court in 1992, appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Plumlee claims that his Sixth Amendment right to counsel was violated by the trial judge's denial of Plumlee's pre-trial motion to substitute counsel on the basis of an irreconcilable conflict that precluded Plumlee's counsel from acting in the role of an advocate. At the time he moved the trial court to appoint alternate counsel, Plumlee reasonably and in good faith believed that members of the Washoe County Public Defender's Office were leaking information about his case to another suspect in the case and to the District Attorney. The resulting distrust that arose between Plumlee and his appointed attorney was such that the attorney himself likened his representation of Plumlee to no representation at all. The judge declined to appoint new counsel. Given the circumstances of this unusual case, we conclude that the judge abused his discretion and that the Nevada Supreme Court's contrary conclusion involved an unreasonable application of clearly established federal law. We therefore reverse.

## I.   BACKGROUND

In 1991, Plumlee was charged in Nevada state court with the armed robbery and murder of Wilbur Richard Beard. Over

the course of Plumlee's representation by the Washoe County Public Defender's Office during 1991 and 1992, a series of incidents caused Plumlee to lose confidence in the attorneys of that office. Three such incidents stand out.

First, Chief Deputy Public Defender Shelly O'Neill was a good friend of John Dewey, who was both Plumlee's roommate prior to his arrest and a suspect for the murder. Shortly after Plumlee's arrest, Plumlee heard that O'Neill, who was the head trial attorney in the Public Defender's Office, had been discussing Plumlee's case with Dewey. Specifically, according to Plumlee's sister, Dewey said that O'Neill had told him that Plumlee had implicated Dewey in the murder, and that O'Neill had suggested Dewey should seek legal counsel.

Second, David Allison, Plumlee's first appointed counsel at the Public Defender's Office, accepted a position with the District Attorney's Office while representing Plumlee. According to Plumlee, Allison lied to him about the fact that he would be taking the job. Prior to Allison's departure for the District Attorney's Office, Plumlee also suspected that Allison was leaking information to the District Attorney's Office. Plumlee's suspicions arose because he had told Allison about the potential evidentiary value of his car and evidence that might be in it, and shortly thereafter, the vehicle, then in police custody, was destroyed.

Third, Steven Gregory, Plumlee's second appointed counsel at the Public Defender's Office, denied the existence of a bail order for Plumlee. Plumlee claims that, when he insisted it existed, Gregory told him he needed psychiatric treatment. The next morning, the District Attorney produced a copy of the order.

Trial was originally set for July 20, 1992. In a series of appearances and pleadings during late May and early June 1992, Plumlee moved the trial court to appoint independent

defense counsel to represent him because the distrust between him and the Washoe County Public Defender's Office had risen to the point that members of the office could not effectively represent him.

Gregory, who was representing Plumlee at the time of his motion to substitute counsel, corroborated Plumlee's assessment of their relationship and even made his own motion to be relieved as counsel.[1] In his affidavit accompanying Plumlee's first motion to relieve counsel, Gregory attested that Plumlee distrusted the Public Defender's Office and believed that members of the office had leaked information about his case. As a result, Gregory explained, Plumlee was "unable to establish an attorney/client relationship with me or any of my colleagues in the Public Defender's Office" and was therefore "unable to properly assist counsel in his defense." At the hearing on the first motion to relieve counsel, Gregory pleaded with the court to be relieved:

> I must say, from my first dealings with Mr. Plumlee, I felt that there was an atmosphere of mistrust. I found it very difficult to establish a relationship with Mr. Plumlee because of the matters that had occurred prior to my even going to work at the Public Defender's Office.
>
> Your Honor, in addition, I cannot think of a case where I have felt compelled to file a Motion To Be Relieved as a Nevada State Public Defender or as a Washoe County Public Defender. This is unique . . . .

---

[1]The first motion to relieve counsel is actually styled a motion to *be relieved* as counsel, but the text indicates it was made on behalf of Plumlee, not the Public Defender's Office. It was not until the trial court's hearing on the motion that it became clear Gregory was making his own motion to be relieved as well.

. . .

> [C]ertainly the failure to properly communicate with counsel or to have confidence or trust in him deters [counsel's] effectiveness. And that's, in reality, the situation we have here.

. . .

> [B]ecause of Mr. Plumlee's mistrust with the Public Defender's Office and anyone attached to the Public Defender's Office, he is unable to properly assist me, therefore, making my efforts less than effective.[2]

After hearing from both Plumlee and Gregory about the lack of trust between them, Judge Lane, the trial judge, denied the various motions to relieve the Washoe County Public Defender's Office and have new counsel appointed. The judge told Plumlee: "Now let me tell you what you are not going to get. You are not going to get this Court to appoint some private lawyer, so that is out." After Judge Lane made clear for the final time that he would not appoint substitute counsel, Plumlee moved to represent himself. Judge Lane granted Plumlee's motion and appointed Gregory and the Public Defender's Office to act as standby counsel. Gregory responded:

---

[2]In one of the hearings, Plumlee explained that he did not question Gregory's legal abilities. "The problem," Plumlee told the judge, "is one of trust." Later on, under questioning from the judge focusing on Steven Gregory's competence, Plumlee responded "yes" when asked if he thought Gregory was competent, and "yes" again when asked if he trusted Gregory. However, in light of Plumlee's repeated motions to substitute counsel, Plumlee's repeated insistence throughout the rest of the proceedings that he did not trust the Public Defender's Office or its members, and Gregory's own testimony about the lack of trust between lawyer and client, this second "yes" by Plumlee appears to be a slip of the tongue in response to the judge's vigorous attempt to talk Plumlee out of going pro se, rather than a reflection of the true state of Plumlee's relationship with his appointed counsel.

> Your honor, we will make a motion at this time to be relieved. It's obvious that the reason Mr. Plumlee wants to represent himself is he doesn't trust the Public Defender's Office. To order us to be stand-by counsel, in effect, gives him no stand-by counsel, and I would urge the Court to appoint some other counsel to represent him.
>
> The main reason this man wants to go pro per is because he doesn't trust us and, frankly, Judge, I don't trust the relationship that I have with Mr. Plumlee. . . .
>
> I am going to beg the Court to appoint outside counsel to act as legal advisor for Mr. Plumlee.

Judge Lane denied the motion.

Judge Lane held an additional hearing to ensure the voluntariness of Plumlee's decision to opt for self-representation. When asked whether he wanted to represent himself, Plumlee replied: "I don't have a choice, Your Honor." The judge responded: "You have a choice. The choice you don't have, unless I am ordered otherwise by the Supreme Court, you do not have the choice of this Court appointing somebody other than the Public Defender." Plumlee then petitioned the Nevada Supreme Court for a writ of mandamus to force Judge Lane to appoint outside counsel. The writ was denied.

Plumlee represented himself at trial. He was convicted by the jury and sentenced to two consecutive life terms in prison and two consecutive nine-year terms to run concurrently with the life terms.

On direct appeal, Plumlee claimed, inter alia, that the trial court's denial of his motion to substitute counsel violated his Sixth Amendment right to counsel and that his resulting decision to represent himself was not voluntary. The Nevada

Supreme Court dismissed the appeal. That court's entire analysis of Plumlee's claim was as follows:

> Absent a showing of adequate cause, a defendant is not entitled to reject court-appointed counsel and substitute other counsel at public expense. *Thomas v. State*, 94 Nev. 605, 607, 584 P.2d 674, 676 (1978). It is within the sound discretion of the trial court to decide whether friction between counsel and client justifies appointment of new counsel. *Id.* A defendant's refusal to cooperate with appointed counsel is no basis for a claim of inadequate representation. *Id.* at 608, 584 P.2d at 676. "Requiring a defendant to choose between waiving counsel and continuing with present counsel is not constitutionally offensive unless defendant's objections to existing counsel are such that he has a right to new counsel." *State v. Staten*, 802 P.2d 1384, 1387 (Wash. Ct. App. 1991). Appellant never showed adequate cause justifying appointment of new counsel, and the court below did not abuse its discretion in refusing to do so.

The issue was never freshly analyzed by the state habeas courts, as both the trial and appellate habeas courts considered the issue foreclosed by the Nevada Supreme Court's ruling on direct appeal.

Nonetheless, at Plumlee's evidentiary hearing on state habeas, Judge Lane himself suggested that Plumlee's distrust of the Washoe County Public Defender's Office was justified. Though Judge Lane recognized that Plumlee had given his lawyers conflicting accounts of his involvement with the murder, and the judge ultimately credited both David Allison's testimony that he had been candid with Plumlee about his plans to join the District Attorney's Office and Shelly O'Neill's testimony that she had not leaked information about Plumlee's case,[3] the judge's remarks indicate the reasonable-

---

[3]In a federal habeas proceeding, a presumption of correctness attaches to state court findings of fact. 28 U.S.C. § 2254(e)(1).

ness of Plumlee's apprehensions about the Washoe County Public Defender's Office. Before hearing the state's witnesses, for example, the judge said that he was inclined to believe Plumlee's allegations regarding Allison and O'Neill:

> I will tell you right now, I was aware of this a little bit while this was going on. I wasn't aware what the depth of it was. . . .
>
> . . .
>
> I think that Ms. O'Neill and the Public Defender's Office was [sic] in dangerous waters. Certain inferences that can be drawn from what was going on in the case and her relationship or lack thereof with Mr. Dewey, what was said, not said to various people, I think that is extremely dangerous. I further think, and I would like to have him here to testify, I probably won't unless the prosecution is going to bring him, I think it is terribly improper to know, I believe Mr. Allison did know that he was going to become a Deputy District Attorney and not tell [Plumlee] that. I think that was extremely out of line. I think it is unprofessional. I don't think anything is wrong with going from one side of the street to the other as long as there are certain professional standards which are kept up with and met. I think it is inappropriate to tell a client facing a murder charge things that aren't true. And I think that probably happened in this case. Knowing Mr. Allison, I think it did happen in this case.[4]

---

[4]The dissent accuses us of taking these remarks out of context; in particular, the dissent calls attention to Judge Lane's characterizations of O'Neill's and Allison's apparent improprieties as "not dispositive." But these characterizations must be taken in their proper context as well. Judge Lane's commentary throughout the hearing reflects his belief that Plumlee's irreconcilable conflict claim was foreclosed in the state habeas pro-

During the hearing, Allison testified that he too had been concerned with possible impropriety stemming from Shelly O'Neill's relationship with John Dewey. Although he would later conclude that O'Neill had not leaked any confidential information, Allison recalled having a "confrontation" with O'Neill about her involvement in the case:

> I knew that Shelly O'Neill knew this John Dewey. Now I had no — I had no concrete evidence. I didn't know exactly what this information was, but the very idea, the very fact it might be happening enraged me. And I went to Shelly and told her that I found her behavior just unethical. . . . I felt that the mere appearance was not good for the office.

After the close of all the evidence, the judge maintained his view that Plumlee's suspicions had been reasonable:

> [I]t is clear Mr. Plumlee didn't trust, didn't like or trust the Public Defender's Officer for reason. And based upon certainly where he was sitting, I can't disagree he had a right to feel that.

Given the reasonableness of Plumlee's perception of the events that led him to lose confidence in the Washoe County Public Defender's Office, Judge Lane even suggested that he might be inclined to grant the petition had the state Supreme Court not (in his view) foreclosed the irreconcilable conflict/forced self-representation argument. Judge Lane stated:

> I certainly believe that the people that went to bat for

---

ceeding because of the prior opinion of the state supreme court. In light of this view, it is clear that the issue regarding which the apparent improprieties were "not dispositive," according to the judge, was Plumlee's ineffective assistance of counsel claim, a claim that was at issue in the state habeas proceeding but is not before us in the instant appeal.

him early on, and because of Mr. Dewey and because of Ms. O'Neill's relationship with Mr. Dewey and because of all the information that got wherever it got, I can understand why Mr. Plumlee felt like he did. I doggone sure can. If that issue hadn't been, in my view at least, foreclosed in the Supreme Court on the direct appeal, maybe it would be a different kettle of fish. But that is not where we are.[5]

After exhausting review in the state courts, Plumlee filed this petition for a writ of habeas corpus in federal district court. The court denied the petition and rejected each of Plumlee's seven asserted grounds for relief. The court analyzed Plumlee's irreconcilable conflict claim under Supreme Court and Ninth Circuit precedent on an attorney's duty of loyalty. Concluding that Plumlee had failed to show an actual conflict of interest that adversely affected his attorney's performance, as required under *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), the district court rejected Plumlee's claim that the

---

[5]Judge Lane's remarks are not entirely consistent with regard to his view of the underlying merits of the irreconcilable conflict claim. When pressed by Plumlee's habeas counsel to consider this claim, Judge Lane replied:

> That is rejected. It is rejected for this reason: One of these days we are going to realize that there has to be some limit here. People cannot come in and say, "Gee, it wasn't the lawyer I wanted." I don't care. The Public Defender is there for a reason. You get the Public Defender. They may not be the best. I happen to think they are not too bad. They may not be the best. You may find some don't do the job. That is what they are there for. They get paid to do it. That is who you get. If you don't like it, too bad. If you want to hire your own lawyer, hire them.

Given that Judge Lane steadfastly maintained that the issue had already been settled, these remarks might best be understood as a defense of the state Supreme Court's ruling by which the judge considered himself bound. In any event, Judge Lane never retreated from his characterization of Plumlee's distrust of his lawyers as reasonable.

state trial court's denial of his motion to have outside counsel appointed had forced him into self-representation.[6]

Plumlee appealed, and the district court issued a Certificate of Appealability under 28 U.S.C. § 2253(c) as to the single issue now before us. We therefore have jurisdiction under 28 U.S.C. § 2253(a).

## II.   ANALYSIS

A district court's denial of habeas relief is reviewed de novo. *Beardslee v. Woodford*, 358 F.3d 560, 568 (9th Cir. 2004). A habeas petitioner under 28 U.S.C. § 2254 cannot obtain relief based on a claim adjudicated on the merits in state court unless

> the adjudication of the claim (1) resulted in a deci-sion that was contrary to, or involved an unreason-able application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

When applying this standard, we review the "last reasoned decision by a state court." *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citation and internal quotation marks omitted). In denying Plumlee's substitution of counsel claim on state collateral review, the Nevada courts never ana-lyzed the claim independently of the Nevada Supreme Court's

---

[6]As the remainder of our opinion makes clear, the district court did not address the gravamen of Plumlee's claim. Plumlee does not claim that external commitments compromised his counsel's loyalty; rather, Plumlee claims that the complete breakdown in their relationship compromised his counsel's ability to act as his advocate at all.

single-paragraph discussion of the issue on direct appeal. It is therefore the Nevada Supreme Court's opinion that we review under 28 U.S.C. § 2254.

"[C]learly established Federal law" under § 2254(d)(1) refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

**[1]** The Supreme Court long ago firmly established principles pertaining to the right to counsel. To be assured of a fair trial, a criminal defendant "requires the guiding hand of counsel at every step in the proceedings against him." *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963) (citation and internal quotation marks omitted). The Sixth Amendment "requires not merely the provision of counsel to the accused, but 'Assistance,' which is to be 'for his defence.' . . . If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984) (quoting U.S. Const. amend. VI).

**[2]** Supreme Court cases illustrate that constitutionally adequate representation can be vitiated not only where counsel has a conflict of interest arising from his duty of loyalty to another client, *see, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), but also where counsel ceases to "function in the active role of an advocate." *Entsminger v. Iowa*, 386 U.S. 748, 751 (1967). Particularly instructive in the latter regard is *Anders v. California*, 386 U.S. 738 (1967), in which the Supreme Court confronted a California practice of refusing to appoint substitute appellate counsel where the first appointed counsel has reviewed the record and has opined to the court that his client's appeal is meritless. *See id.* at 739-740 & n.2. The Court held that this procedure was constitutionally inadequate, because it "did not furnish petitioner with *counsel acting in the role of an advocate* nor did it provide that full consideration and resolution of the matter as is obtained when

counsel is acting in that capacity." *Id.* at 743 (emphasis added); *see also Cronic*, 466 U.S. at 656 ("[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' " (quoting *Anders*, 386 U.S. at 743)).

**[3]** *Morris v. Slappy*, 461 U.S. 1 (1983), upon which the State relies, did nothing to undermine the vitality of the requirement that counsel act as an advocate. In *Morris*, the Court rejected the theory that the Sixth Amendment encompasses the right to a "meaningful attorney-client relationship," and consequently held that the defendant's Sixth Amendment rights had not been violated by the trial court's refusal to grant a continuance to enable the defendant's preferred public defender to represent him. *Id.* at 12-14. The habeas petitioner in *Morris* had initially presented his claim as one of irreconcilable conflict between client and counsel, but the Court found that the defendant's allegation of an irreconcilable conflict was simply unsupported on the facts of the case. *See id.* at 4 (explaining that "[t]he facts shown by the record conclusively rebut" the claim of irreconcilable conflict); *id.* at 13 (stressing that the defendant had told the trial court he was "satisfied" with the substitute public defender and had "specifically disavowed any dissatisfaction with counsel"). In rejecting the "meaningful relationship" theory on the law and the irreconcilable conflict theory on the facts, *Morris* demonstrates that these two claims are distinct from each other. Thus, the Court's holding that a defendant has no right to a "meaningful relationship" with his attorney in no way suggests a retreat from the principle that the defendant is entitled to an attorney who acts as his advocate, or a rejection of the theory that an attorney-client relationship can be so dysfunctional as to render counsel unable to provide the constitutional minimum of adequate representation in the role of advocate.

The Court has helpfully summarized the distinction between the principle of attorney-as-advocate and the "meaningful relationship" claim rejected in *Morris*:

> [I]n evaluating Sixth Amendment claims, the appro-
> priate inquiry focuses on the adversarial process, not
> on the accused's relationship with his lawyer as
> such. Thus, while the right to select and be repre-
> sented by one's preferred attorney is comprehended
> by the Sixth Amendment, the essential aim of the
> Amendment is *to guarantee an effective advocate for
> each criminal defendant* rather than to ensure that a
> defendant will inexorably be represented by the law-
> yer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988) (citations and internal quotation marks omitted) (emphasis added). In other words, an impecunious defendant has no right to ask the court for a particular lawyer, but whoever is appointed must act as his advocate.

**[4]** Although the Supreme Court, in applying these princi-ples, has never considered the precise circumstances present in Plumlee's case, the Court has explained that "[s]ection 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer*, 538 U.S. at 76. While the holdings of the Supreme Court are the indisputable focus of the "clearly established Federal law" inquiry, we have recognized that circuit precedent "may be persuasive authority for pur-poses of determining whether a particular state court decision is an unreasonable application of Supreme Court law, and may also help us determine what law is clearly established." *Robinson*, 360 F.3d at 1057 (citations and internal quotation marks omitted); *see also Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003) ("[T]he objective reasonableness of a state court's application of Supreme Court precedent may be estab-lished by showing other circuits having similarly applied the precedent."); *Ouber v. Guarino*, 293 F.3d 19, 26 (1st Cir. 2002) ("To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appro-

priate in assessing the reasonableness *vel non* of the state court's treatment of the contested issue." (citation and internal quotation marks omitted)); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc) ("[W]e do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable."). "Therefore, when faced with a novel situation we may turn to our own precedent, as well as the decisions of other federal courts, in order to determine whether the state decision violates the general principles enunciated by the Supreme Court and is thus contrary to clearly established federal law." *Robinson*, 360 F.3d at 1057.

**[5]** We have elucidated the meaning of the Supreme Court's right to counsel decisions in situations in which a severe conflict between counsel and client is said to deprive a defendant of his Sixth Amendment rights. In the foundational case on this issue, we held: "[T]o compel one charged with grievous crime to undergo a trial with the assistance of an attorney *with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever*." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) (citing *Gideon* and *Entsminger*) (emphasis added). A natural corollary of this holding is that where the erroneous denial of a motion to substitute counsel prompts a defendant to choose self-representation, reversal of the conviction is warranted in spite of the client's "choice" to represent himself. *United States v. Williams*, 594 F.2d 1258, 1260 (9th Cir. 1979) (per curiam). On the duty of a trial court to appoint substitute counsel in the face of irreconcilable conflict or complete breakdown in communication between counsel and client, there is near-unanimity among the circuits. *See United States v. Mullen*, 32 F.3d 891, 897 (4th Cir. 1994) (holding that the trial court abused its discretion in refusing to appoint substitute counsel where "there was a total breakdown in communication between [counsel and client]" that "ma[de] an adequate defense unlikely"); *Smith v. Lockhart*, 923 F.2d

1314, 1320 (8th Cir. 1991) (explaining that a defendant is entitled to a substitution of counsel where there exists "a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant"); *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir. 1987) (same); *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985) (same); *United States v. Welty*, 674 F.2d 185, 188 (3d Cir. 1982) (same); *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973) (same); *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972) (same); *see also United States v. Zillges*, 978 F.2d 369, 372 (7th Cir. 1992) (in evaluating motion to substitute counsel, court must consider several factors, including "whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense"); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir. 1986) (same); *cf. United States v. Graham*, 91 F.3d 213, 221 (D.C. Cir. 1996) ("A defendant [has] the right to effective representation by appointed counsel, and this right may be endangered if the attorney-client relationship is bad enough.").[7] These "convergent holdings" (all but one prior to the Nevada Supreme Court's 1995 decision on Plumlee's direct appeal) "reflected and applied clearly established federal law as determined by the U.S. Supreme Court" as of the time of the relevant state court decision. *Robinson*, 360 F.3d at 1059.

Having identified the governing legal principles, we must decide whether the Nevada Supreme Court's decision was "contrary to" or "an unreasonable application of" these princi-

---

[7]The Eleventh Circuit has not definitely ruled on the viability of an irreconcilable conflict claim. That court's most relevant decision to date is *Thomas v. Wainwright*, 767 F.2d 738 (11th Cir. 1985). While it cited the Fifth Circuit's *Young* decision for the proposition that a trial court should inquire into the reasons behind an alleged client-counsel conflict, the court in *Thomas* held that, on the facts of that case, no Sixth Amendment violation had occurred because it was the defendant's own obstinance that had thwarted the trial court's efforts to understand the alleged conflict. *Id.* at 741-43.

ples. A state court's decision is "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law" set forth in Supreme Court cases or "confronts a set of facts that are materially indistinguishable" from a Supreme Court decision and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. Under the "unreasonable application" prong, relief may not be granted unless the state court decision was "objectively unreasonable," as opposed to merely erroneous or even clearly erroneous. *Lockyer*, 538 U.S. at 75-76.

In this case, the Nevada Supreme Court's application of the imperatives we have identified from the Supreme Court's right-to-counsel jurisprudence — namely, counsel who is an advocate for the defendant, *Anders*, 386 U.S. at 743; *Entsminger*, 386 U.S. at 751, and who provides "actual Assistance for the accused's defence," *Cronic*, 466 U.S. at 654 (citation and internal quotation marks omitted) — was objectively unreasonable.

**[6]** Stemming from Plumlee's objectively reasonable belief that his lawyers had betrayed him, the lack of trust on both sides was so severe that Plumlee's attorney not only corroborated Plumlee's claim that the relationship had broken down, but even made his own motion to be relieved. *Cf. United States v. Moore*, 159 F.3d 1154, 1160 (9th Cir. 1998) (finding irreconcilable conflict where counsel told the court: "it seems to me that if Mr. Moore is forced to go to trial now with me as his attorney, that he will be denied a fundamental right; that

is, to have counsel, effective, a zealous counsel"); *United States v. D'Amore*, 56 F.3d 1202, 1206 (9th Cir. 1995) (finding irreconcilable conflict where counsel testified to his "inability to represent Defendant D'Amore in this matter"), *overruled on other grounds*, *United States v. Garrett*, 179 F.3d 1143, 1145 (9th Cir. 1999) (en banc); *United States v. Walker*, 915 F.2d 480, 483-84 (9th Cir. 1990) (finding irreconcilable conflict where counsel told the court: "I do believe that there is, given his refusal to confer with me, there is a [sic] irreconcilable difference that does prevent me from representing him"), *overruled on other grounds*, *United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000), *in turn overruled*, *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002) (en banc). After Plumlee went pro se, Gregory strenuously objected to being appointed stand-by counsel. Gregory's words are notable:

> *To order us to be stand-by counsel, in effect, gives him no stand-by counsel.* . . . [H]e doesn't trust us and, frankly, Judge, I don't trust the relationship that I have with Mr. Plumlee. . . . *I am going to beg the Court to appoint outside counsel* to act as legal advisor for Mr. Plumlee.

(emphasis added).

[7] Even more compelling than Gregory's assessment were the words of the trial judge himself, who, during the state habeas proceedings, took the unusual step of second-guessing his own previous denial of Plumlee's motion:

> [I]t is clear Mr. Plumlee . . . didn't like or trust the Public Defender's Officer for reason. *And based upon certainly where he was sitting, I can't disagree he had a right to feel that.*
>
> . . .

[B]ecause of Mr. Dewey and because of Ms. O'Neill's relationship with Mr. Dewey and because of all the information that got wherever it got, *I can understand why Mr. Plumlee felt like he did. I dog-gone sure can. If that issue hadn't been, in my view at least, foreclosed in the Supreme Court on the direct appeal, maybe it would be a different kettle of fish.*

(emphasis added).

Plumlee's relationship with the members of the Washoe County Public Defender's Office was broken beyond repair. Plumlee knew it. Gregory knew it. By the time Judge Lane had finished with the case, he knew it too.

This is not a case in which the client-counsel conflict resulted simply from the defendant's obstinance or delaying tactics. To the extent Plumlee did not cooperate with the lawyers of the Public Defender's Office, his behavior was an inevitable by-product of his apprehensions — which the very judge who denied Plumlee's motion to substitute counsel later indicated were reasonable — about his lawyers' loyalty and willingness to be true advocates for him. Plumlee believed that two of his lawyers had betrayed him and that another thought he was crazy. Though Judge Lane ultimately found that Plumlee's suspicions of disloyalty were untrue, the judge "doggone sure" could "understand why Mr. Plumlee felt like he did."

The conflict that resulted was acute. Addressing the judge in open court, Steven Gregory likened the Public Defender's representation of Plumlee to no representation at all. We must agree.[8]

---

[8]Recently, in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006), the Supreme Court reaffirmed that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal

**[8]** Under these unusual circumstances, holding that Plumlee received representation that comported with the Sixth Amendment guarantee of counsel who is an advocate for the defendant, *Anders*, 386 U.S. at 743; *Entsminger*, 386 U.S. at 751, and who provides "actual Assistance for the accused's defence," *Cronic*, 466 U.S. at 654 (citation and internal quotation marks omitted), was not merely erroneous but objectively unreasonable. *See Lockyer*, 538 U.S. at 75-76. A defendant simply cannot be expected to cooperate with attorneys he reasonably believes are working behind his back to undermine his defense. In this case, Plumlee's reasonable perception of this type of betrayal — on the part of not one but two different attorneys in the Washoe County Public Defender's Office — led to an obvious and extreme conflict that constructively deprived Plumlee of any meaningful representation as the Supreme Court has understood that term.[9]

---

defendant to be represented by his attorney of choice. Writing for the majority, Justice Scalia further held that "erroneous deprivation of the right to counsel of choice" is structural error requiring the reversal of a subsequent conviction. *Id.* at 2564. The Court also explicitly noted that the right to counsel of choice "does not extend" to cases in which defendants "require counsel to be appointed for them." *Id.* at 2565.

Plumlee's claim is different. He was deprived entirely of legal counsel. The deprivation he suffered is different in kind and even greater than that suffered by Gonzalez-Lopez. To be sure, Plumlee claims that he did not want to be represented by his particular attorney. But the constitutional violation was not that he was denied "the right to counsel of [his] choice." *Id.* at 2562. Instead, it was that the justifiable distrust of his attorney became so acute that Plumlee was denied his clearly established Sixth Amendment right to have an attorney "acting in the role of an advocate." *Anders*, 386 U.S. at 743.

[9]We note that the same result obtains if we apply our own circuit's test for evaluating the denial of a motion to substitute counsel. Under this test, we consider three factors: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the conflict between client and counsel, and (3) the extent of the conflict itself. *Moore*, 159 F.3d at 1158-59.

Here, there is no question that Plumlee's motion was timely, as he made it on three separate occasions commencing more than a month before trial

   **[9]** Having shown that an irreconcilable conflict with his lawyer deprived him of actual assistance of counsel, a habeas petitioner need not make the further showing that the trial judge's erroneous refusal to appoint substitute counsel resulted in prejudice, because "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see also Moore*, 159 F.3d at 1158.[10]

---

was originally scheduled to begin. *See, e.g., id.* at 1159, 1161 (finding timely a motion to substitute counsel made two and a half weeks before trial); *D'Amore*, 56 F.3d at 1206-07 (finding timely a motion made on the eve of a probation revocation hearing where the defendant had attempted to communicate his request to the court ten days earlier).

   The adequacy of the trial judge's inquiry here presents a closer question. By the time he denied Plumlee's final motion to substitute counsel, Judge Lane had discussed the conflict with both Plumlee and his attorney, but some of the inquiry inappropriately focused on counsel's competence rather than the conflict between client and counsel, *see United States v. Adelzo-Gonzalez*, 268 F.3d 772, 778 (9th Cir. 2001); *Walker*, 915 F.2d at 483, and the judge did not question client and counsel "privately and in depth," *Moore*, 159 F.3d at 1160.

   It is the third factor, the extent of the conflict, that tips the scales strongly in Plumlee's favor, as our main analysis makes clear.

   By noting the confluence of our analysis of Plumlee's claim with well-established circuit law, we do not mean to suggest that we are faulting the Nevada Supreme Court for failing to analyze Plumlee's claim precisely as we would have. Applying our own test and arriving at the result that Supreme Court precedent dictates merely serves to buttress our conclusion that the Nevada Supreme Court's decision was an objectively unreasonable application of clearly established Supreme Court law.

   [10]Although we refused to apply a per se prejudice rule to the irreconcilable conflict claim in *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc), that case involved a defendant's counsel-substitution motion that the court had essentially lost. *Id.* at 1021, 1025-26. We therefore remanded for an evidentiary hearing regarding the extent of the conflict and whether the conflict resulted in the constructive denial of counsel. *Id.* at 1027-28. Importantly, we noted: "In the event that the trial court determines that a serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required." *Id.* at 1027 (citing *Strickland*, 466 U.S. at 692).

The trial court violated Plumlee's Sixth Amendment right to counsel by refusing to appoint substitute counsel in the face of an irreconcilable conflict between Plumlee and his attorney. As a result, Plumlee's decision to represent himself cannot be considered voluntary, and his conviction therefore cannot stand. *Williams*, 594 F.2d at 1260.

Before concluding, we feel we must briefly respond to the dissent's accusations that we are distorting the facts, introducing a subjective and "rudderless" standard into the law, and inviting "volumes of litigation" by encouraging defendants to concoct conspiracy theories about their defense attorneys.

As to our interpretation of the facts, the dissent's criticism is largely directed at a straw man. Specifically, the dissent characterizes our opinion as crediting Plumlee's suspicions about his lawyers' perfidy as actually based on fact. We make no such contention. Rather, we conclude only that Plumlee's suspicions were objectively *reasonable*. This conclusion is relevant to demonstrate that "the conflict was not of [the defendant's] own making," a finding that would defeat Plumlee's claim of entitlement to substitute counsel. *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc).

According to the dissent, by considering Plumlee's "objectively reasonable belief" in evaluating whether the irreconcilable conflict was of Plumlee's own making, we have applied a subjective and "rudderless" standard. This charge relies on a highly selective reading of our opinion. In particular, the dissent ignores the phrase "objectively reasonable," which we have deliberately employed to modify "belief." The dissent also mischaracterizes our opinion as suggesting that a defendant's beliefs alone entitle him to new counsel. We have said nothing of the kind. What entitled Plumlee to new counsel was not the fact of Plumlee's suspicions themselves (however reasonable) but the irreconcilable conflict these suspicions engendered.

Finally, despite the dissent's dire predictions, we do not open the door for defendants and habeas petitioners to flood the courts with Sixth Amendment claims by conjuring up groundless fears about their attorneys. We have never held that a defendant can simply manufacture a conflict out of thin air and demand new counsel; we certainly do not so hold today. A defendant is simply not entitled to new counsel if "the conflict was . . . of [the defendant's] own making." *Schell*, 218 F.3d at 1026. As our discussion indicates, the conflict between Plumlee and his lawyers arose from objectively reasonable (though not necessarily accurate) suspicions, rather than from a self-serving attempt by Plumlee to sabotage his attorney-client relationship in order to obstruct or delay the proceedings. We cannot imagine that the extraordinary circumstances present here — appointed counsel who precipitously withdraws to accept a position with the prosecutor's office, another public defender's continuing close relationship with the defendant's roommate (a potential suspect in the case), the resulting and fully understandable incapacity of the second appointed counsel to gain the defendant's trust, and finally the second counsel's heartfelt report to the court that his representation of the defendant is the equivalent of no representation at all — will often, if ever, be replicated, or that our opinion could spawn the "volumes of litigation" our dissenting colleague fears.

## III.   CONCLUSION

**[10]** The Sixth Amendment entitles a defendant to counsel who "function[s] in the active role of an advocate." *Entsminger*, 386 U.S. at 751. This is clearly not what Plumlee got. The trial court should have appointed new counsel for Plumlee; its failure to do so deprived Plumlee of his right to counsel under the Sixth Amendment. The Nevada Supreme Court's ruling to the contrary "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (internal punctuation modified).

**[11]** We therefore reverse and remand with instructions to grant a conditional writ of habeas corpus ordering that petitioner be released unless the state retries him within a reasonable time as set by the district court.

**REVERSED AND REMANDED.**

**Volume 2 of 2**

BEA, Circuit Judge, dissenting:

Bypassing the clear restraints enacted by Congress in AEDPA, and fashioning a new rule raising a defendant's suspicions and personal pique to constitutional dimensions, the majority orders the release of Plumlee thirteen years after he was imprisoned—for two terms of life without the possibility of parole—for robbing and murdering Wilbur Richard Beard. Were that not enough, the majority's "irreconcilable conflict" rule augurs innumerable problems for public defenders and trial courts; if allowed to stand, it will generate volumes of litigation for both direct and collateral appeals for years to come.

I fundamentally disagree with the majority's presentation of the facts, their reading of the law, and their conclusion that the Nevada Supreme Court's decision rejecting petitioner Plumlee's "irreconcilable conflict" claim was "an unreasonable application of clearly established Federal law" under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1).

First, the facts. The majority skews their rendition of the facts by largely relying on only one version of the story — the story presented by Plumlee. The majority fails to consider the wealth of evidence—presented by numerous witnesses other than Plumlee—that contradict Plumlee's claims of conflicts with, and improprieties by, the Washoe County Public Defender's Office ("Public Defender"). Had the majority considered the full record, they could not have engaged in their exercise of second-guessing the state court's factual findings. Put simply: the evidence contrary to Plumlee's claims supplies the "reason" that makes the state court's findings *not* an "unreasonable determination of the facts."

Second, the law. The majority sets forth a rudderless, subjective rule for finding an "irreconcilable conflict" between a criminal defendant and his counsel, focusing solely on

whether the defendant had a "reasonable" belief that his counsel could not effectively represent him regardless whether the "reason" for such belief was based on nothing but the defendant's result-driven suspicions. This novel rule radically expands upon the "irreconcilable conflict" doctrine and is unsupported—and indeed conflicts—with U.S. Supreme Court precedent and our own precedent. Contrary to the rule adopted by the majority, a finding of an "irreconcilable conflict" requires specific, objective evidence of a conflict—one not caused by the defendant—which rises to such a level that counsel could not or would not act as an effective advocate account the conflict.

For those reasons, I respectfully dissent.

## I.  The Facts

Because I disagree with the majority's presentation of the facts, I first consider the scope of our review under 28 U.S.C. § 2254(d)(2).[1] Deference to the state court's factual findings is the hallmark of that section. "[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

The majority relies upon three claimed sources of conflict between Plumlee and his appointed counsel from the Public Defender. It next references statements made by Judge Mills Lane III, who presided over Plumlee's trial and state habeas proceedings. Last, it cites statements made by Steven Gregory, Plumlee's second-appointed Public Defender attorney. On the basis of those claims and statements, the majority con-

---

[1]Under section 2254(d)(2), we have the authority to grant a writ of habeas corpus where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

cludes an "irreconcilable conflict" existed between Plumlee and the Public Defender because Plumlee "reasonably and in good faith believed that members of the [Public Defender] were leaking information about his case to another suspect in the case and to the District Attorney . . . [and t]he resulting distrust that arose between Plumlee and his appointed [Public Defender] attorney was such that the attorney himself likened his representation of Plumlee to no representation at all." Majority op. at 17383. In reaching that conclusion, the majority disregards the voluminous evidence suggesting Plumlee's distrust was based on incidents that either did not occur or were fabricated by Plumlee, and misrepresents the context in which the statements were made by Gregory and Judge Lane. I discuss below each of Plumlee's claimed sources of conflict relied upon by the majority and place into correct context the statements made by Judge Lane and Gregory.

## A.   Plumlee's Three Claims of Conflict, Each and All Uncorroborated, and Overwhelmingly Contradicted by the Evidence

### 1.   The O'Neill "Leak"

The majority begins with Plumlee's claim that Shelly O'Neill, the chief public defender with the Public Defender, divulged confidential information to John Dewey, who was a friend of O'Neill and Plumlee's former roommate. The majority states that "according to Plumlee's sister, Dewey said that O'Neill had told him that Plumlee had implicated Dewey in the murder, and that O'Neill had suggested Dewey should seek legal counsel." Majority op. at 17384.

This claim is supported by only two statements, both made by Plumlee. First, Plumlee stated at a pre-trial hearing that Dewey told him that O'Neill told Dewey "he should contact a lawyer because [Plumlee] was implicating him in the murder." (ER 60.)[2] At the later evidentiary hearing on his state

---

[2]Although it is customary to eliminate record citations in published opinions because few readers have access to the original record sources,

habeas petition, Plumlee contradicted himself and testified that his sister told him she had "talked to John Dewey. John Dewey had informed her Shelly O'Neill . . . had said that I had implicated him in the murder." (ER 162.)

The unreliability of this claim is immediately evident. Plumlee's testimony at the evidentiary hearing is flatly inconsistent with his first version, and it is also not just hearsay, it is *quadruple* hearsay. Notably, Plumlee's sister never testified.[3]

Two witnesses controverted Plumlee's claim. Dewey testified and denied that O'Neill told him to seek legal counsel or not to talk to Plumlee.[4] (ER 145-47.) Dewey explained he was friends with Plumlee and O'Neill, and when Plumlee was first accused of murder, Dewey took Plumlee to Dean Heidrich, O'Neill's husband and an attorney, for legal advice. (ER 141-143.) Knowing that Plumlee could not afford an attorney, Dewey also spoke to O'Neill regarding how Plumlee could obtain a public defender. (ER 144, 148.)

O'Neill also testified and denied that Dewey ever came to her to tell her he was a suspect in the crime, nor did Dewey tell her Plumlee implicated him in the murder. (ER 187.) Nor

---

I make an exception here because of the importance of accuracy in setting forth the facts, and to allow the majority the opportunity to point out where I have misread the record. Citations to the Excerpts of Record filed with this court are abbreviated as "ER." I note other sources and their abbreviations as they arise.

[3]Indeed, the state attorney objected to Plumlee's testimony on hearsay grounds, but the state court allowed it. (ER 162.) Plumlee's counsel later attempted to introduce an affidavit from Plumlee's sister, but the court denied introduction of the affidavit as hearsay. (Tr. of Post-Conviction Hr'g, Dec. 4, 1997, (hereinafter "PCH") at 81.) One could suppose the state court judge allowed Plumlee's earlier testimony because it did not prejudice Plumlee, and had so little probative weight it would also not prejudice the state.

[4]Indeed, Dewey testified he later learned he was a suspect in the murder not from O'Neill, but from the Sparks Police Department. (ER 152.)

did she recall telling Dewey that Plumlee had accused him or that Dewey was a suspect in the murder. (ER 189.) To the contrary, O'Neill corroborated Dewey's testimony that Dewey and she met to discuss only how Plumlee could acquire a public defender and obtain release on bail.[5] (ER 193.)

In written findings of fact,[6] the state habeas court found: "Shelly O'Neill did not receive or reveal any confidential communications from Plumlee at any time about Plumlee's case, nor did she reveal any confidential communications to anyone, particularly Plumlee's friend, Mr. Dewey." (Supplemental Excerpts of Record (hereinafter "SER") Ex. 5 at 2.)

Putting on one side Plumlee's contradictory claims of treachery, and on the other Dewey and O'Neill's testimony, can we honestly say the state court made an "unreasonable determination of the facts" in choosing to believe Dewey and O'Neill's testimony over Plumlee's? Clearly it was not *unreasonable* for the state court to find there was no basis for a conflict between Plumlee and the Public Defender because of O'Neill's contact with Dewey.

---

[5]The majority also relies on testimony by David Allison, Plumlee's first-appointed public defender, that he "had been concerned with possible impropriety stemming from Shelly O'Neill's relationship with John Dewey," and had so confronted O'Neill. Majority op. at 17390. The majority's reliance is misplaced; Allison's suspicions arose only from Plumlee's own statements to Allison. Plumlee told Allison that someone in the Public Defender had leaked privileged information to Dewey. (ER 198.) Allison knew O'Neill was friends with Dewey and thus confronted O'Neill, but Allison later testified "the information that had flowed [between O'Neill and Dewey] was information that Ms. O'Neill had from just being a lawyer. She was talking about procedural matters in general, legal subjects. Nothing — there was not privileged information leaking from the [Public Defender], and that sort of settled the matter." (ER 199.)

[6]After the evidentiary hearing on Plumlee's state habeas petition, Judge Lane issued and signed a twelve-page written findings of fact and conclusions of law. This document, largely ignored by the majority, contains specific findings of fact controverting most of Plumlee's claims of conflict with the Public Defender.

## 2.   The Allison "Leak"

Second, the majority states:

> According to Plumlee, Allison lied to him about the fact that he would be taking [a job at the Washoe County District Attorney's Office ("District Attorney")]. Prior to Allison's departure . . . , Plumlee also suspected that Allison was leaking information to the District Attorney's Office. Plumlee's suspicions arose because he had told Allison about the potential evidentiary value of his car and evidence that might be in it, and shortly thereafter, the vehicle, then in police custody, was destroyed.

Majority op. at 17384.

Again, these claims of conflict are supported only by Plumlee's own statements. First, at the state evidentiary hearing, Plumlee testified Allison lied to him when Plumlee asked if Allison was going to take a position with the District Attorney. (ER 173-74.) Yet Allison denied ever lying to Plumlee about taking a position with the District Attorney. (PCH at 109.) He confirmed that while he was representing Plumlee, he received a job offer from the District Attorney, and the offer was "to take effect virtually immediately." (PCH at 108, 111.) Allison also testified he had been seeking a position at the District Attorney for over two years (before representing Plumlee), that he accepted the offer immediately, and Allison then told Plumlee "this would not affect [Plumlee's] case in any way. [Allison] would not be involved with anyone that had anything to do with [Plumlee's case] in the District Attorney's Office." (PCH at 108-09.) In written findings of fact, the state court found that when Allison took the position at the District Attorney, he had no contact with Plumlee or his case, and Plumlee's claim he was never informed of the job switch was not credible. (SER Ex. 5 at 6.)

Second, in a pre-trial motion to substitute counsel,[7] Gregory averred generally that Plumlee told him that Allison divulged confidential information to the District Attorney. (ER 41.) Beyond that general averment, Plumlee stated only once during the state evidentiary hearing that Allison divulged information to the District Attorney regarding the potential exculpatory value of the vehicle. Plumlee testified: "It was my belief that information was being passed on to the [District Attorney], such as when I informed him of the vehicle's potential value, the vehicle no longer existed." (Tr. of Post-Conviction Hr'g, Dec. 4, 1997, (hereinafter "PCH") at 46.) After that statement, Plumlee never again claimed Allison conspired with the District Attorney to destroy Plumlee's vehicle. Plumlee did not allege that claim in his federal habeas petition, (ER 24-25) nor did he argue that claim before this court in his briefs. Instead, Plumlee argued only that Allison provided ineffective assistance of counsel—separate from his "irreconcilable conflict" claim, and not at issue here—by failing to preserve potentially exculpatory evidence in the vehicle. (ER 21.)

Plumlee's "divulging information" claim was flatly controverted by defense counsel Gregory and Allison. At a pre-trial hearing, Gregory told the state court that he spoke with Allison and the prosecutor regarding Plumlee's claim of confidentiality breaches; both individuals assured Gregory that Allison had not discussed and would not discuss the case with the District Attorney. (ER 48.) In accepting those representations, the state court found Allison did not divulge any information to the District Attorney. (ER 51.)

Plumlee later filed a motion to disqualify the District Attorney from prosecuting the case on the ground Allison had earlier represented Plumlee but then took a position with the

---

[7]Plumlee brought multiple motions to substitute counsel, variously styling them "Motions to Relieve" and "Motions to Be Relieved." For clarity's sake, I refer to them generally as motions to substitute.

District Attorney. (Mot. to Disqualify, June 5, 1992, at 1.) At the hearing on the motion, Allison testified he never divulged any privileged information regarding Plumlee to the prosecutor, any other person in the District Attorney, or anyone in law enforcement. (Tr. of Hr'g on Mot. to Disqualify, June 9, 1992, at 4-5.) The trial court denied the motion, finding no reason to disqualify the District Attorney. (*Id.* at 6.)

After the state evidentiary hearing, the trial court found in written findings of fact that "[t]he police released Plumlee's vehicle to the lienholder, but without the knowledge or consent of Allison." (SER Ex. 5 at 5.) The court also found "the release of Plumlee's vehicle was not the result of bad faith or connivance on the part of the police or the prosecution." (SER Ex. 5. at 6.)

Again, putting on one side Plumlee's claims that Allison lied to him about accepting a position with the District Attorney and that Allison divulged information regarding Plumlee's vehicle to the District Attorney, and on the other Allison's denial that he lied to Plumlee, and Allison's and Gregory's denials that either informed or connived with the District Attorney to destroy Plumlee's vehicle, can we honestly say the state court made an "unreasonable determination of the facts" in choosing to believe Allison's and Gregory's testimony over Plumlee's? Clearly, it was not *unreasonable* for the state court to believe Allison and Gregory and to disbelieve Plumlee, leading it to find there was no basis for a conflict between Plumlee and the Public Defender.

### 3.   The Gregory Bail Order Denial

Third, the majority states: "Gregory, Plumlee's second-appointed counsel at the [Public Defender], denied the existence of a bail order for Plumlee. Plumlee claims that when he insisted it existed, Gregory told him he needed psychiatric treatment. The next morning, the District Attorney produced a copy of the order." Majority op. at 17384.

One could interpret this claim in two ways. First, one could infer discord in the attorney-client relationship if Gregory was telling Plumlee he needed psychiatric treatment. Second, one could infer even greater discord, even an "irreconcilable conflict," if Gregory was conspiring with the prosecution by denying the existence of a bail order for Plumlee, thus impeding Plumlee's defense by keeping him in jail when a bail order was outstanding.

But again, Plumlee's claim is supported only by his own statements. At a pre-trial hearing, Plumlee claimed Gregory lost the bail order, but Plumlee found it, told Gregory about it, and the next day the prosecutor coincidentally produced a copy of it. (ER 60-61.) Notably, Plumlee made no statement at the pre-trial hearing that Gregory told Plumlee he needed "psychiatric treatment." At the conclusion of the hearing, the trial court concluded the loss of the bail order was a result of miscommunication, not of any conspiracy.[8] (ER 61.)

At the state evidentiary hearing, Plumlee repeated his claim regarding the bail order, but added that when he informed Gregory that he had found the bail order, Gregory told Plumlee he "needed psychiatric treatment, because no bail order existed." Plumlee also testified he told Gregory not to discuss the discovery of the bail order with the prosecutor, but the next morning, the prosecutor coincidentally claimed to have found the order. (ER 169-70.)

---

[8]Indeed, the loss of the bail order resulted from the state court's error, not that of the Public Defender. At Plumlee's arraignment, the state court took the issue of bail under advisement, (Arraignment Tr., June 11, 1991, at 5-6), then later issued an order stating "bail should remain as is." (Order, June 25, 1991, at 1.) The court later realized bail had not yet been set and issued an order setting bail at $100,000. (Order, July 2, 1991, at 1) (also found at ER 35.) Indeed, during one of the bail hearings, Gregory noted the bail order had gone missing, *the state court could not find it in its files*, but Gregory later received a copy of the order from the prosecutor when the prosecutor found it in his files. (Tr. of Hr'g on Mot. to Reduce Bail, June 9, 1992, at 7.)

Yet again, this claim was controverted by Gregory. Gregory denied having any communication with the District Attorney regarding the bail order. (ER 66.) Plumlee's statement that Gregory told him he needed "psychiatric treatment" was not raised during Gregory's direct or cross-examination at the evidentiary hearing.

Thus, the only evidence supporting this claim is Plumlee's own testimony. Plumlee did not raise the "psychiatric treatment" story until long after the statement was purportedly made, and Gregory denied having any communication with the District Attorney regarding the bail order.

Again, putting Plumlee's relation of events on one side, and Gregory's on the other, can we say the state court made an "unreasonable determination of the facts" in accepting Gregory's version? Clearly, it was not *unreasonable* for the state court to determine the lost bail order was a miscommunication rather than a conspiracy between the Public Defender and the District Attorney.

## B.  Statements Made by Judge Lane

In addition to the three claims discussed *supra*, the majority also relies upon statements made by Judge Lane at the evidentiary hearing over which he presided. The majority states that Judge Lane's comments

> suggested that Plumlee's distrust of the [Public Defender] was justified. Though Judge Lane recognized that Plumlee had given his lawyers conflicting accounts of his involvement with the murder, and the judge ultimately credited both David Allison's testimony that he had been candid with Plumlee about his plans to join the [District Attorney] and Shelly O'Neill's testimony that she had not leaked information about Plumlee's case, the judge's remarks indi-

cate the reasonableness of Plumlee's apprehensions
about the [Public Defender].

Majority op. at 17388-89; *see id.* at 17400 (stating "the very
judge who denied Plumlee's motion to substitute counsel later
indicated [Plumlee's apprehensions] were reasonable.").

The majority reaches that conclusion by engaging in a
selective and isolated reading of the evidentiary hearing tran-
script. Taken in proper context, Judge Lane neither suggested
Plumlee's distrust of the Public Defender was justified, nor
did his remarks "indicate the reasonableness" of Plumlee's
distrust. What follows is an expanded passage of the transcript
cited in part by the majority. To place it into context, the pas-
sage reflects comments made by Judge Lane at the close of
Plumlee's presentation of evidence (which the majority to
their credit recognizes), but before the state presented any wit-
nesses or argument. The portions quoted by the majority are
in regular type, the omitted portions are in italics, and I under-
line several passages which I consider telling:

> *THE COURT: . . . I will tell you right now, I am not*
> *going to [make any findings yet], because I am not*
> *sure what it is going to be yet until I hear some fur-*
> *ther stuff,* <u>*I am not going to give any preview what*</u>
> <u>*my decision is*</u>. I will tell you right now, I was aware
> of this a little bit while this was going on. I wasn't
> aware what the depth of it was. *We didn't have it*
> *flushed out. You have done a good job flushing it*
> *out.*
>
> *In my view, Mr. Allison did not do the kind of job*
> *a good, first rate defense counsel would do.* <u>*That is*</u>
> <u>*not disposistive*</u>. [sic] <u>*I will make that statement right*</u>
> <u>*here on the record for anybody to see*</u>.
>
> *Number two,* I think that Ms. O'Neill and the
> [Public Defender] was [sic] in dangerous waters.

Certain inferences that can be drawn from what was going on in the case and her relationship or lack therefor with Mr. Dewey, what was said, not said to various people, I think that is extremely dangerous. I further think, and I would like to have him here to testify, I probably won't unless the prosecution is going to bring him, I think it is terribly improper to know, I believe Mr. Allison did know that he was going to become a Deputy District Attorney and not tell your client that. I think that was extremely out of line. I think it is unprofessional. I don't think anything is wrong with going from one side of the street to the other as long as there are certain professional standards which are kept up with and met. I think it is inappropriate to tell a client facing a murder charge things that aren't true. And I think that probably happened in this case. *Knowing Mr. Allison, I think it did happen in this case. But I don't think that is dispositive of the issue*.

*I also think that your client's, I don't want to use the word bravado, that is not the word, but your client's coyness about what his lawyer had to know, what his lawyer didn't have to know is inappropriate. I mean to say, "All you have got to know is I didn't do it. You get out there and show it," that is not going to get it in my view.*

*I don't know where that leads us.* But your client didn't do very much to help himself even when he had lawyers that might have been able to help him. If I was representing him, I doggone sure would want to know everything, bad and good.

(ER 179-80.)

As noted, Judge Lane made these comments before the state had presented any witnesses or argument. Immediately

after Judge Lane made the above statements, the state attorney
stated: "I am a little concerned, with all due respect, you
might have decided something about him without evidence in
this case, just deciding on what this guy [Plumlee] said." (ER
181.) Judge Lane responded: "No. I said I want to hear the
evidence." (ER 181.) Judge Lane then twice reassured the
state attorney that he had not "prejudged" the merits of Plum-
lee's claims. (ER 182, 184.)

The majority's contention that those comments establish
that Plumlee's distrust of the Public Defender was "reason-
able" or "justified" are belied by Judge Lane's insistence that
he had not "prejudged" the merits of Plumlee's claims, espe-
cially since the comments were made when Plumlee's case
was in, but the state had yet to present its case. Indeed, at the
conclusion of the evidentiary hearing, Judge Lane issued writ-
ten findings that Allison was candid with Plumlee about tak-
ing a position with the District Attorney, had no contact with
Plumlee or his case after taking a position with the District
Attorney, and O'Neill had not leaked any confidential infor-
mation to Dewey. (SER Ex. 5 at 2, 6.) The majority summa-
rily discounts that contrary evidence.

In an attempt to support further its conclusion, the majority
also quotes from Judge Lane's comments at the close of all
of the evidence. I offer below another expanded portion of the
transcript:

> *THE COURT: But let me ask you this question,*
> *which to me goes to the heart of part of your posi-*
> *tion.*
>
> *MS. CARTLEDGE [Plumlee's attorney]: Yes, sir.*
>
> *THE COURT: First,* it is clear Mr. Plumlee didn't
> trust, didn't like or trust the [Public Defender] for
> reason. And based upon certainly where he was sit-
> ting, I can't disagree he had a right to feel that. *Cer-*

*tainly he may have felt that way for good reason, at least in his own.*

*Now when everything finally shook out, he said, "I don't want a lawyer in the [Public Defender]." "I said, sorry, if you don't want a lawyer in the [Public Defender]. You pay for your own, otherwise you get the Public Defender." Whether I am right or wrong on that, and being right or being wrong is sometimes very elastic, the Supreme Court in dismissing the appeal I guess, I guess sub silentio is saying the trial judge did not commit legal error. So we wind through this thing. Ultimately, Mr. Plumlee winds up being his own attorney. That is what we wind up with. Well, now, that sums up kind of everything. We already know that the Supreme Court has said I am not wrong by saying you can't get somebody else. So he's saying, "I don't want you. I am going to do it myself." Well, if he does it himself, he can't get up and say, "Gee, I had ineffective assistance of counsel." He's the counsel."*

(PCH at 177-78.)

The majority claims that passage supports the proposition that Judge Lane "maintained his view that Plumlee's suspicions had been reasonable." Majority op. at 17390. Judge Lane said nothing of the sort. He stated that "based upon certainly where [Plumlee] was sitting, I can't disagree he had a right to feel that." (PCH 177; *see* PCH 184 (Judge Lane stated: "I can understand why Mr. Plumlee felt like he did. I doggone sure can.").) All those statements mean is that because Plumlee was sitting as a defendant in a murder case, facing a possible life sentence, one could expect him to raise a claim to the *emotional feeling* of being betrayed by the Public Defender. But apart from this emotion, did Plumlee have a *reason*, based on objective fact, to conclude he was being betrayed? No. As noted above, Judge Lane found O'Neill did

not divulge confidential information to Dewey. (SER Ex. 5 at
2.) Judge Lane found Allison did not lie to Plumlee about tak-
ing a position with the District Attorney, nor did he conspire
with the District Attorney to destroy exculpatory evidence.
(SER Ex. 5 at 5-6.) Judge Lane found Gregory did not con-
spire with the District Attorney to hide a lost bail order. (ER
61.) Although Plumlee may have had a subjective distrust of
the Public Defender, Judge Lane found *no reason* for Plumlee
to conclude he was being betrayed.

Finally, the majority states that "Judge Lane even sug-
gested that he might be inclined to grant the petitioner had the
state Supreme Court not (in his view) foreclosed the irrecon-
cilable conflict/forced self-representation argument." Majority
op. at 17390. This is flat wrong.

Judge Lane did consider the "irreconcilable conflict" issue
foreclosed by the Nevada Supreme Court's earlier decision,
but then expressly stated that even if he would reconsider the
issue, he would still reach the same conclusion. After Plum-
lee's counsel insisted Judge Lane could consider the issue
whether the trial court erred in not substituting counsel, Judge
Lane responded:

> *Well, it is raised. Ms. Cartledge, you made the
> record.* That is rejected. It is rejected for this reason:
> One of these days we are going to realize that there
> has to be some limit here. People cannot come in and
> say, "Gee, it wasn't the lawyer I wanted." I don't
> care. The Public Defender is there for a reason. You
> get the Public Defender. They may not be the best.
> I happen to think they are not too bad. They may not
> be the best. You may find some don't do the job.
> That is what they are there for. They get paid to do
> it. That is who you get. If you don't like it, too bad.
> If you want to hire your own lawyer, hire them.

(PCH at 187-88.)

The majority discounts this passage by arguing that it "might best be understood as a defense of the state Supreme Court's ruling by which the judge considered himself bound. In any event, Judge Lane never retreated from his characterization of Plumlee's distrust of his lawyers as reasonable." Majority op. at 17391 n.5. Yet by its plain terms, the passage contradicts the majority's conclusion. Even if the issue wasn't foreclosed by the Nevada Supreme Court, Judge Lane was not inclined to grant Plumlee's petition. Although Judge Lane's comments are not packaged in the most sympathetic terms, his statement that "[o]ne of these days we are going to realize that there has to be some limit here. People cannot come in and say, 'Gee, it wasn't the lawyer I wanted,' " is comparable with the Nevada Supreme Court's rejection of Plumlee's "irreconcilable conflict" claim; that court stated "Appellant never showed adequate cause justifying appointment of new counsel, and the court below did not abuse its discretion in refusing to do so." (ER 124.)

## C.   Statements Made by Defense Counsel Gregory

The majority also places special emphasis on Gregory's statements that Plumlee did not trust the Public Defender and, by extension, Gregory. The majority notes in an affidavit accompanying a motion to substitute, Gregory attested that

> Plumlee distrusted the [Public Defender] and believed that members of the office had leaked information about his case. As a result, Gregory explained, Plumlee was "unable to establish an attorney/client relationship with me or any of my colleagues in the [Public Defender]" and was therefore "unable to properly assist counsel in his defense."

Majority op. at 17385. The majority also notes Gregory stated that "because of Mr. Plumlee's mistrust with the [Public Defender] and anyone attached to the [Public Defender], he

is unable to properly assist me, therefore, making my efforts less than effective." *Id.* at 17386; *see id.* at 17387 (Gregory stated: "The main reason this man wants to go pro per is because he doesn't trust us and, frankly, Judge, I don't really trust the relationship that I have with Mr. Plumlee. . . . I am going to beg the Court to appoint outside counsel to act as legal advisor for Mr. Plumlee.").

The reasoning for Gregory's statements are, of course, highly relevant in identifying whether an "irreconcilable conflict" existed between Plumlee and Gregory; and if so, whose fault was that? The majority grasps at Gregory's statements as support for their finding of an "irreconcilable conflict," but a closer look at the statements and their context suggest a different and reasonable conclusion, one accepted by the Nevada Supreme Court. In rejecting Plumlee's claim of an "irreconcilable conflict," the court recognized that "a defendant's refusal to cooperate with appointed counsel is no basis for a claim of inadequate representation." (ER 124.) The record supports the conclusion that Plumlee refused to cooperate with Gregory and the Public Defender, both through contumacious behavior and his intention to commit perjury.

In his first motion to substitute counsel, Plumlee made no specific claims against the quality of Gregory's representation, other than he mistrusted the entire Public Defender's office. (ER 40-42.) At the hearing on the motion, Gregory stated he had "worked very hard to establish a relationship of trust with Mr. Plumlee. I think that's an impossibility because of certain matters that have occurred in this case." (ER 47-49.) Gregory stated part of Plumlee's mistrust arose from Plumlee's suspicions regarding Allison, but Gregory noted they also arose from "certain matters that are — that I consider serious that would fall under the category of *privileged communications*." (ER 50) (emphasis added.) The state court denied the first motion to substitute.

The issue of "privileged communications" arose again when Plumlee brought a second motion to substitute or, in the alternative, to represent himself. At the hearing on the motion, Gregory stated "we are in a Catch-22. *I can't disclose . . . that type of privileged communication.* I can just offer myself to the Court as indicating that I feel that there is real difficulty with the [Public Defender], myself and Mr. Hylin [another public defender] representing Mr. Plumlee." (ER 57) (emphasis added.) During this hearing, Plumlee himself conceded he did not question Gregory's "excellence in law," stated twice he agreed Gregory was competent, and also that he trusted Gregory. (ER 62, 64-65).[9] Indeed, after discussing self-representation with the court, Plumlee withdrew his motion to represent himself and the court denied the motion to substitute. (ER 68.)

The next day, Plumlee renewed his motion to represent himself, which the court granted,[10] appointing Gregory to act

---

[9]The majority discounts Plumlee's expressions of confidence in Gregory as a "slip of the tongue in response to the judge's vigorous attempt to talk Plumlee out of going pro se." Majority op. at 17386 n.2. That reasoning flatly contradicts our limited standard of review under AEDPA. Plumlee's own concession regarding the confidence he had in Gregory contradicts the majority's conclusion that Plumlee's other statements of distrust were made in good faith. Indeed, the concession supports the Nevada Supreme Court's conclusion that Plumlee's conflict with the Public Defender was of his own making, rather than as a result of improprieties by the Public Defender. We do not have the authority to review that conclusion *de novo* or even for clear error; instead, we have the authority to grant a writ of habeas corpus only if that conclusion was unreasonable. *See* 28 U.S.C. § 2254(d)(2); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness.").

[10]In granting the motion, the state court found that "Plumlee has willfully, knowingly, consciously and competently requested he be allowed to represent himself." (ER 91-92.) After the evidentiary hearing on Plumlee's state habeas petition, the state court issued a written finding that "Plumlee knowingly and voluntarily waived his constitutional right to counsel." (SER Ex. 5 at 11.) Other than Plumlee's "irreconcilable conflict" claim, there is no dispute that Plumlee knowingly and voluntarily waived his right to representation. *See Faretta v. California*, 422 U.S. 806, 835 (1975).

as stand-by counsel. (ER 77.) Gregory moved to be relieved because he didn't "really trust the relationship that I have with Mr. Plumlee. I feel very uncomfortable talking to him one on one because of certain things that have occurred *that I cannot relate to the Court . . . .*" (ER 77-78) (emphasis added). Gregory also stated "I am going to beg the Court to appoint outside counsel" for Plumlee. (ER 78.) The court denied Gregory's motion to be relieved. (ER 78.)

As can be expected, at the evidentiary hearing on Plumlee's state habeas petition, the state focused upon Plumlee's difficulties with Gregory. The resulting testimony suggested the difficulties between Gregory and Plumlee resulted not from actions on the part of Gregory or the Public Defender, but instead from Plumlee's own recalcitrance. During the hearing, Plumlee admitted he was uncooperative with his counsel and initially refused to assist them in his defense. (PCH at 54-56.) Plumlee also admitted to lying repeatedly to his attorneys, resulting in Gregory having ethical concerns that Plumlee would perjure himself. (ER 170-71; PCH at 53, 152-54, 162-64.)

First, Plumlee testified that in developing his defense theory with Allison, he "told Mr. Allison I am just going by what the police report said. I let him know from the start that I wasn't even going to discuss [the defense theory]. When it came for trial, that is when we would go over that." (PCH at 54.) Plumlee also testified he did not consider it important to tell Allison the truth regarding his defense theory; Plumlee testified Allison "really did not need to know those certain facts, no, he did not. . . . All Mr. Allison needed to know was I did not commit the murder. If Mr. Allison had done any investigation, it would have showed everything else." (PCH at 54-55.)

Second, Plumlee testified that in 1991, at the beginning of his representation by the Public Defender, he told Allison he was *not* present at the murder scene. (PCH at 53.) Plumlee

changed his story around January 1992; this change was pre-cipitated by the return of DNA evidence from the police lab, which confirmed the victim's blood was in Plumlee's car.[11] (PCH at 51, 59-60.) Plumlee then stated he *was* present at the scene. (PCH at 53.) Plumlee also testified that around the time of his pre-trial motions to substitute, Plumlee changed stories again:

> I had told Gregory what had actually transpired as far as the murder was concerned. Gregory said, "Be-cause you had not been forthcoming with the [Public Defender], I cannot question you on the stand." He said, "This will help you go pro per because, number one, if you have to represent yourself, it will become a narrative. But what should happen is when you go pro per, I will stand up and ask that he appoint stand-by counsel outside the [Public Defender].

(ER 170-71.)

Gregory confirmed Plumlee repeatedly changed his story and lied to the Public Defender. (PCH at 152-54.) Gregory testified he had an "ethical reservation" because of Plumlee's dishonesty and because Plumlee had stated he intended to tes-tify at the trial.[12] (PCH at 162-63.) Gregory denied, however, telling Plumlee he couldn't represent him because of his ethi-cal reservations. (PCH at 164.) Instead, Gregory testified that as appointed counsel and later as stand-by counsel, he and the Public Defender

> did everything in our power to create a defense for

---

[11]Gregory confirmed Plumlee initially changed his story around the time the DNA evidence returned. (PCH at 154-55.)

[12]In Nevada, trial counsel cannot knowingly adduce perjurious testi-mony, and can refuse "to offer evidence that the lawyer reasonably believes is false." Nev. R. Prof'l Conduct 172. However, if the defendant represents himself, such an ethical conflict for counsel disappears.

Mr. Plumlee whenever he came up with a story or a variation of a story. The problem was, when we would point out to him that he had a fatal hole or some sort of illogic in the story, then a week later he would have another version. And he had a habit of lying to us.[13]

(PCH at 154.)

A reasonable conclusion from the foregoing is that Gregory requested to be relieved not because of his own refusal to represent Plumlee or present a defense, but because Plumlee would not cooperate with Gregory or other Public Defender attorneys, and because Plumlee's frequent dishonesty raised ethical problems for Gregory. The Nevada Supreme Court implicitly adopted such a conclusion when it determined Plumlee "never showed adequate cause justifying appointment of new counsel." (ER 124.) That conclusion was not an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).

### D. Summary

In sum, Plumlee's claim of a conflict with the Public Defender can arise from two theories. The first theory, proposed by Plumlee and endorsed by the majority, is that the

---

[13]Indeed, Gregory testified that as appointed and standby counsel, he and the Public Defender undertook "extensive and exhaustive" investigative efforts for Plumlee at his urging. (PCH at 154, 157, 160.) In written findings of fact, the state court found Gregory and a Public Defender investigator thoroughly pursued each line of investigation proposed by Plumlee. (SER Ex. 5 at 8-9.) Despite that finding, the majority insists that Plumlee's relationship with the Public Defender was "broken beyond repair." Majority op. at 17400. Such a conclusion is perplexing considering the cooperation between Plumlee and Gregory; that evidence weighs against Plumlee's claim that he so mistrusted Gregory and the Public Defender that they could not provide effective representation for his defense.

Public Defender sold Plumlee out by (1) leaking confidential information to another suspect (Dewey); (2) leaking confidential information to the District Attorney and destroying exculpatory evidence; (3) impeding Plumlee's defense by keeping him in jail while a bail order was outstanding; and (4) lying to Plumlee about Allison's plans to transfer to the District Attorney.

The second theory, endorsed by the Nevada Supreme Court and which is certainly not *unreasonable*, is that (1) Plumlee kept his attorneys in the dark by refusing to cooperate beyond denying his guilt and telling his attorneys to go out and prove his innocence; (2) Plumlee lied to his attorneys, beginning with his story that he was not at the murder scene, which was perforce changed when the DNA evidence confirmed the victim's blood was in Plumlee's vehicle; and (3) attorney Gregory had well-founded ethical reservations about Plumlee possibly perjuring himself at trial.

The Nevada Supreme Court picked the second theory, probably because it was offered through more and better witnesses, and because the former theory rested solely on Plumlee's own statements, a slim reed on which to base a claim of "irreconcilable conflict." The court stated that Plumlee "never showed adequate cause justifying appointment of new counsel." (ER 124.) That conclusion is supported by the record under even a "clear error" standard — *i.e.*, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Yet under 28 U.S.C. § 2254(d)(2), we may grant Plumlee's habeas petition only if that conclusion "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The U.S. Supreme Court has held that for purposes of 28 U.S.C. § 2254(d)(1), the "unreasonable" standard of review is even more deferential then the "clear error" standard. *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). I see no reason to use a different definition of the

term "unreasonable" in section 2254(d)(2) than used in (d)(1), and thus, it follows that if the factual findings are not clearly erroneous, perforce they must not be an "unreasonable determination of the facts" under section 2254(d)(2).

With a more complete understanding of the facts of this case, I turn now to the majority's primary conclusion; that is, the Nevada Supreme Court's decision that Plumlee "never showed adequate cause justifying appointment of new counsel" (ER 124) was an unreasonable application of clearly-established federal law as determined by the U.S. Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

## II.   The Law

Under 28 U.S.C. § 2254(d)(1), we have authority to grant a writ of habeas corpus if "the state court identifies the correct governing legal principle from [U.S. Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75. Our review is highly deferential; we can grant the habeas petition only if the state court's application of clearly established law is "objectively unreasonable."[14] *Id.*

The majority misreads U.S. Supreme Court precedent and radically expands the breadth of the "irreconcilable conflict" doctrine. Indeed, the rudderless, subjective rule applied by the majority has no support in U.S. Supreme Court precedent or our own precedent. The effect of the rule will be felt by more cases than this one; it will spawn numerous problems between

---

[14]I agree with the majority that with respect of the issue whether Plumlee had a federal constitutional right to a court-appointed counsel other than the Public Defender, the "last-reasoned state-court decision" here is the Nevada Supreme Court's April 27, 1995 opinion affirming Plumlee's convictions on direct review. (ER 124.) The state habeas court relied upon that decision in rejecting Plumlee's claim at issue here, and the Nevada Supreme Court relied on that earlier decision in affirming the denial of Plumlee's state habeas petition. (ER 215.)

public defenders and their clients and generate volumes of lit-
igation from contumacious defendants.

## A.  Clearly-Established Federal Law

The Sixth Amendment "guarantees that 'in all criminal
prosecutions, the accused shall enjoy the right . . . to have the
Assistance of Counsel for his defence.' " *Wheat v. United
States*, 486 U.S. 153, 158 (1988) (quoting U.S. Const. amend.
VI). The right to counsel encompasses appointment of coun-
sel for the indigent, and is "designed to assure fairness in the
adversary criminal process." *Id.* That latter point should not
be ignored; "the purpose of providing assistance of counsel 'is
simply to ensure that criminal defendants receive a fair
trial.' " *Id.* at 159 (quoting *Strickland v. Washington*, 466 U.S.
668, 689 (1984)).

The U.S. Supreme Court has emphasized that "in evaluat-
ing Sixth Amendment claims, 'the appropriate inquiry focuses
on the adversarial process, not on the accused's relationship
with his lawyer as such.' " *Id.* (quoting *United States v.
Cronic*, 466 U.S. 648, 657 (1984)). Although "the right to
select and be represented by one's preferred attorney is com-
prehended by the Sixth Amendment, the essential aim of the
Amendment is to guarantee an effective advocate for each
criminal defendant rather than to ensure that a defendant will
inexorably be represented by the lawyer whom he prefers."
*Id.* It naturally follows that "a defendant may not insist on
representation by an attorney he cannot afford . . . ." *Id.* at
159; *see Caplin & Drysdale v. United States*, 491 U.S. 617,
624 (1989) ("Petitioner does not, nor could it defensibly do
so, assert that impecunious defendants have a Sixth Amend-
ment right to choose their counsel. The Amendment guaran-
tees defendants in criminal cases the right to adequate
representation, but those who do not have the means to hire
their own lawyers have no cognizable complaint so long as

they are adequately represented by attorneys appointed by the courts.").**[15]**

*Morris v. Slappy*, 461 U.S. 1 (1983), is similar to the facts here and deserves closer examination than it was given by the majority. There, the petitioner was charged with rape, robbery, burglary, forcible oral copulation, and false imprisonment. *Slappy v. Morris*, 649 F.2d 718, 719 (9th Cir. 1981), *rev'd sub nom. Morris v. Slappy*, 461 U.S. 1 (1983). The trial court appointed public defender Harvey Goldfine as the petitioner's counsel. Six days before trial, public defender Bruce Hotchkiss replaced Goldfine because Goldfine was hospitalized for surgery. *Id.* On the day of trial, the petitioner complained to the trial court Hotchkiss had insufficient time to prepare for trial; Hotchkiss disagreed and stated he was prepared. *Id.* The trial court interpreted the petitioner's statement as a motion for continuance to substitute counsel and denied it. *Id.*

The petitioner thereafter refused to cooperate with Hotchkiss. During trial, the petitioner interrupted the proceedings, at one time claiming Hotchkiss told him that he had no defense to his charges.**[16]** *Id.* at 719 n.1. The jury convicted the

---

**[15]**The majority asserts that the Supreme Court's recent decision in *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557 (2006) "reaffim[s] that the Sixth Amendment guarantees not only the right to legal counsel, but also the distinct right of a criminal defendant to be represented by his attorney of choice." 426 F.3d at 1107 n.8. The majority mischaracterizes the *Gonzalez-Lopez* holding. *Gonzalez-Lopez* did not recognize the right of a criminal defendant to counsel "of his choice" anymore than it recognized the "right" of a shopper to goods "of his choice" in a shop—that is, unless the shopper pays for the goods or convinces the store-keeper to make them a present. The first paragraph of the majority's footnote would be less liable to be quoted mischievously in the future, were the opinion to survive, if the words "of his choice" carry with them: "so long as he could arrange to pay such counsel, or have such counsel agree to render services without expectation of payment."

**[16]**During the interruptions, the defendant insisted his right to counsel was being infringed. For example, the following colloquy occurred between defendant and the trial court:

petitioner of robbery, burglary, and false imprisonment, but deadlocked on the rape and forcible oral copulation charges. The court ordered a mistrial on those counts, which the state retried the next week. *Id.*

"Communication between Slappy and Hotchkiss broke down to such a point during the second trial that *Hotchkiss asked the court to remove him as counsel because he felt he could not render effective assistance in the face of such conflict*. After a conference in chambers, Hotchkiss withdrew his motion." *Id.* at 719-20 (emphasis added). The petitioner was convicted on the rape and forcible oral copulation charges. *Id.* at 720. The state courts affirmed the convictions on appeal, and the federal district court denied the petitioner's habeas petition. *Id.*

We reversed, holding the trial court violated the petitioner's Sixth Amendment rights by refusing to grant a continuance until Goldfine could represent the petitioner. *Id.* We reasoned

---

THE DEFENDANT: What do I have to say to get through to you, your Honor, what do I have to say to make you understand. I have told you two or three times, and then you keep telling me about talking to my Counsel. I don't have no attorney, I told you I don't have no attorney. My attorney's in the hospital, my attorney's name is Mr. P.D. Goldfine, Harvey Goldfine, that's my attorney, he's in the hospital.

THE COURT: Well, I am going to ask you then under the circumstances, Mr. Slappy, to remain in the Courtroom and to listen to the proceedings and listen to the progress of this case.

THE DEFENDANT: That's up to you, that's up to you what you do, your Honor. If you say so I'll remain here, but I am not participating in the trial, I'm through with it, as of now I am through with this trial. *I was through with it the 24th when this P.D. told me that I didn't have no defense from my charges. I was through then, and that's why I didn't see him when he come down to see me.*

*Slappy*, 649 F.2d at 719 n.1 (emphasis added).

a defendant's right to counsel "include[s] the right to a meaningful attorney-client relationship," and concluded the petitioner's relationship with Hotchkiss was "without substance" because the petitioner did not "have confidence in [Hotchkiss's] ability to represent the petitioner's best interests."[17] *Id.* at 720-21.

The U.S. Supreme Court reversed. The Court counseled that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris*, 461 U.S. at 11; *see Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) ("not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights."). The Court admonished us that our

> conclusion that the Sixth Amendment right to counsel "would be without substance if it did not include the right to *a meaningful attorney-client relationship*," is without basis in the law. No authority was cited for this novel ingredient of the Sixth Amendment guarantee of counsel, and of course none could be. No court could possibly guarantee that a defendant will develop the kind of rapport with his attorney—privately retained or provided by the public—that the Court of Appeals thought part of the Sixth Amendment guarantee of counsel.

*Morris*, 461 U.S. at 13-14 (emphasis in original, internal citation omitted).

Notably, the Court also rejected the petitioner's "irreconcilable conflict" claim. Recognizing that the petitioner claimed

---

[17]The petitioner also argued he had an "irreconcilable conflict" with Hotchkiss, but we did not reach that issue because we reversed on the ground the trial court erred in refusing to grant a continuance. *Id.*

in his habeas petition "that the state trial court abused its discretion by failing to order a substitution of counsel after the defendant and counsel became embroiled in irreconcilable conflict," *id.* at 4 (internal quotation marks and alterations omitted), the Court held that "the facts shown by the record conclusively rebut [this] claim[ ] and are alone dispositive, independent of the correctness of the novel Sixth Amendment guarantee announced by the Court of Appeals." *Id.* Accordingly, the Court reversed our judgment and remanded with instructions to deny the defendant's habeas petition. *Id.* at 15.[18]

The U.S. Supreme Court has also held a conflict between a defendant and counsel does not implicate Sixth Amendment rights when the conflict is premised upon the defendant's plan to perjure himself. *Nix v. Whiteside*, 475 U.S. 157, 176 (1986). There, the defendant was charged in state court with

---

[18]The majority distinguishes *Morris* on the ground "that the defendant's allegation of an irreconcilable conflict was simply unsupported on the facts of the case." Majority op. at 17394. Yet the facts in *Morris*, presented in both the Supreme Court's opinion and our own, are nearly indistinguishable from the present case. The petitioner in *Morris* refused to cooperate with his counsel, stated his counsel told him he had no defense to the charges, interrupted the proceedings to argue his right to counsel was being infringed, and attorney-client communication broke down to such a point that counsel moved to be relieved by the court because he could not render effective assistance account the conflict. *See Morris*, 461 U.S. at 5-9; *Slappy*, 649 F.2d at 719. The majority ignores the clear comparison between *Morris* and the present case, arguing only that *Morris* did not reject the "irreconcilable conflict" doctrine. Majority op. at 17394. I agree *Morris* did not reject the doctrine, but *Morris* did reject the petitioner's claim that an "irreconcilable conflict" existed because the facts of the case did not support such a claim. When faced with a set of facts indistinguishable from a U.S. Supreme Court decision, we (as well as state courts) are still bound by that decision. *See Lockyer*, 538 U.S. at 73 ("a state court decision is contrary to our clearly established precedent . . . if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." (internal quotation marks omitted)). With respect, the majority simply fails to follow higher authority by ignoring the guidance provided by *Morris*.

murder, initially telling his attorney he shot the victim in self-
defense when he saw the victim had a gun. *Id.* at 160-61. The
defendant later admitted to counsel he did not see a gun, but
would testify that he did see one. Counsel advised the defen-
dant he would not suborn perjury, and if the defendant per-
sisted in his plan, the attorney would so advise the court. *Id.*
The defendant testified he did not see a gun, and he was con-
victed. *Id.* at 161-62. The state courts affirmed the conviction,
the district court denied the defendant's federal habeas peti-
tion, but the court of appeals reversed, holding the defendant
received ineffective assistance of counsel because counsel
threatened to advise the court of the defendant's perjurious
plan. *Id.* at 163. The U.S. Supreme Court reversed:

> Here, there was indeed a "conflict," but of a quite
> different kind; it was one imposed on the attorney by
> the client's proposal to commit the crime of fabricat-
> ing testimony without which, as he put it, "I'm
> dead." This is not remotely the kind of conflict of
> interests dealt with in *Cuyler v. Sullivan*[, 446 U.S.
> 335 (1980)]. Even in that case we did not suggest
> that all multiple representations necessarily resulted
> in an active conflict rendering the representation
> constitutionally infirm. If a "conflict" between a cli-
> ent's proposal and counsel's ethical obligation gives
> rise to a presumption that counsel's assistance was
> prejudicially ineffective, every guilty criminal's con-
> viction would be suspect if the defendant had sought
> to obtain an acquittal by illegal means. Can anyone
> doubt what practices and problems would be
> spawned by such a rule and what volumes of litiga-
> tion it would generate?

*Id.* at 176.

Drawing on the above precedent, we have observed that an
"irreconcilable conflict" can exist when "the conflict between
[a defendant] and his attorney had become so great that it

resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell*, 218 F.3d at 1026. Yet we also observed that if the conflict between the defendant and his counsel was caused by the defendant, or "arose over decisions that are committed to the judgment of the attorney and not the client," no Sixth Amendment violation accrues. *Id.*

In *Schell*, we concluded the petitioner's allegations in his habeas petition of an "irreconcilable conflict" with his counsel were sufficient to entitle him to an evidentiary hearing in federal district court:

> Schell says that a dispute with his public defender over the only evidence in the prosecution's case that could link him to the crime became hostile and resulted in the disintegration of communications both with him and with members of his family about her preparation of his defense. Counsel allegedly told Schell that she would not waste government money on a fingerprint expert, and that he should not waste the court's time or money on a trial and should accept the plea bargain. If true, this explanation may have been tantamount to her telling him that she would neither investigate his case nor defend him unless he pleaded guilty.

*Id.* at 1026-27. On that basis, we held the defendant was entitled to an evidentiary hearing because if the defendant was able to establish those claims, he would be entitled to habeas relief under the pre-AEDPA standard of review. *Id.* at 1027.

## B.   The "Irreconcilable Conflict" Rule

From those cases, one can infer the proposition[19] that a

---

[19]*See Williams v. Taylor*, 529 U.S. 362, 382 (2000) ("rules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.")

defendant's subjective evaluation of his counsel's perfor-
mance, or subjective belief in the existence of a conflict with
his counsel, do not create an "irreconcilable conflict." *See
Cronic*, 466 U.S. at 657; *Wheat*, 486 U.S. at 159. Instead, an
"irreconcilable conflict" requires specific objective evidence
of a significant internal conflict between the defendant and
counsel that rises to such a level that counsel could not or
would not act as an effective advocate account the conflict.
*See Cronic*, 466 U.S. at 659 n.21. But if the evidence shows
the defendant created the conflict, either through plans to
commit perjury, disagreement over decisions committed to
the judgment of the attorney and not the client, or refusal to
cooperate with counsel, then such conflict is insufficient to
serve as an "irreconcilable conflict." *See Nix*, 475 U.S. at 176;
*Morris*, 461 U.S. at 13-14; *Schell*, 218 F.3d at 1026.

I turn now to the Nevada Supreme Court's decision to
determine whether that court unreasonably applied clearly
established federal law as determined by the U.S. Supreme
Court. *See* 28 U.S.C. § 2254(d)(1).

## C.   The Nevada Supreme Court's Decision

The majority sets forth the Nevada Supreme Court's opin-
ion rejecting Plumlee's "irreconcilable conflict" claim. Two
sentences of that court's opinion are key: the court stated "[a]
defendant's refusal to cooperate with appointed counsel is no
basis for a claim of inadequate representation," and then con-
cluded that Plumlee "never showed adequate cause justifying
appointment of new counsel, and the court below did not
abuse its discretion in refusing to do so." (ER 124.)

The Nevada Supreme Court's conclusion is supported by
the record and was a reasonable application of clearly estab-
lished federal law. As noted in Section I, Plumlee offered
multiple unsupported allegations of conspiracy and impropri-
ety by the Public Defender, but the Nevada Supreme Court
found those allegations inadequate to afford relief. The

Nevada Supreme Court could reasonably determine from the record that (1) Plumlee refused to cooperate with his attorneys beyond denying guilt; (2) Plumlee lied to his attorneys, repeatedly changing his defense theory as each new theory proved inconsistent with the trial evidence; and (3) Gregory had ethical reservations about Plumlee possibly perjuring himself in court. As noted *supra*, such client-generated "conflicts" do not rise to the level of an "irreconcilable conflict."

Both *Morris* and *Schell* support this conclusion. In *Morris*, a pre-AEDPA case, the U.S. Supreme Court rejected the petitioner's "irreconcilable conflict" claim on the basis the facts did not support relief. 461 U.S. at 4. The defendant complained to the trial court regarding his counsel's level of preparation; refused to cooperate with counsel; stated that his counsel told him he had no defense for his charges; interrupted the proceedings to argue his right to counsel was being infringed; and communication between the petitioner and counsel broke down to such a point that counsel moved to be relieved by the court because he could not render effective assistance account the conflict. *Id.* at 5-9; *see Slappy*, 649 F.2d at 719, *rev'd sub nom. Morris*, 461 U.S. at 1.

On other hand, in *Schell*, we determined the petitioner was entitled to an evidentiary hearing because if the facts he alleged were true, he would be entitled to habeas relief under the pre-AEDPA standard of review. 218 F.3d at 1027. The petitioner alleged a dispute arose with counsel over the only evidence in the prosecution's case to link him with the crime; the dispute became so hostile communications broke down between counsel, the petitioner, and the petitioner's family; and counsel told the petitioner "she would not waste government money on a fingerprint expert, and that [the petitioner] should not waste the court's time or money on a trial and should accept the plea bargain." *Id.* at 1026-27. We considered that statement by counsel "tantamount to telling [the petitioner] that [counsel] would neither investigate his case nor defend him unless he pleaded guilty." *Id.*

In comparison, Plumlee's proof falls woefully short. Plumlee never established the Public Defender attorneys violated attorney-client confidentiality, conspired with the District Attorney to destroy evidence, or refused to investigate the case or defend Plumlee unless he pleaded guilty. Further, the record strongly suggests Plumlee's refusal to cooperate with his counsel caused the conflict with Gregory and the Public Defender, leading Gregory to move to be relieved by the court because he could not render effective assistance account the conflict. Yet the same event occurred in *Morris*, but recognizing counsel's request to withdraw was caused by the petitioner's bad faith, the U.S. Supreme Court rejected an "irreconcilable conflict" claim on that basis. *See Morris*, 461 U.S. at 13-14; *Schell*, 218 F.3d at 1026 (stating that if "the conflict was of [the defendant's] own making," a claim of "irreconcilable conflict" cannot lie).

Moreover, Plumlee's habit of lying to his attorneys, and Gregory's resulting "ethical reservation" which arose from the risk of Plumlee lying under oath, did not deny Plumlee his Sixth Amendment right to adequate representation. *Nix* disposed of such a notion in holding that a defendant's consideration to commit perjury, and his counsel's refusal to suborn perjury, do not create a sufficient conflict to implicate the defendant's Sixth Amendment rights. 475 U.S. at 176.

It cannot be said that because Plumlee claimed some conflict with his attorney, even a claim with which Gregory concurred in his plea to be relieved, that alone requires appointment of counsel outside of the Public Defender at taxpayer expense. Just as a defendant has no Sixth Amendment right to a "meaningful relationship" with his court-appointed counsel, *see Morris*, 461 U.S. at 13-14, he has no right to be shielded from differences with his counsel at public expense, so long as the professional services rendered by the attorney are adequate. *See Wheat*, 486 U.S. at 159; *Cronic*, 466 U.S. at 657. Especially is this so when the conflict between a defendant and counsel can only be found with reason, and as

the state court did, on Plumlee's refusal to cooperate and planned perjury.

The Nevada Supreme Court's decision that Plumlee "never showed adequate cause justifying appointment of new counsel, and the court below did not abuse its discretion in refusing to do so," was not an unreasonable application of clearly-established federal law. Having failed to meet the AEDPA standard, Plumlee is not entitled to habeas relief.

## D.   The Defects in the Majority's Rule

Nonetheless, in a radical expansion of the "irreconcilable conflict" doctrine, the majority constructs a rule that such a conflict exists when a defendant has an "objectively reasonable belief" that his counsel cannot effectively represent him, even if the "reason" for such an "objectively reasonable belief" is wholly based on the defendant's story, contradicted by sworn testimony. *See* Majority op. at 17398. This rudderless, subjective[20] standard is unsupported by precedent from

---

[20]The majority attempts to disguise the massive breadth of this rule through the use of words like "objectively reasonable belief" and "good faith." *See* Majority op. at 17383, 17398. The reason that the majority's "objectively reasonable belief" standard is subjective and rudderless is not because I ignore the term "objectively reasonable," but because, as applied to the facts by the majority, its standard allows Plumlee's *claims*, found to be without foundation by the Nevada courts, to suffice to establish an "objectively reasonable belief." As noted in Section I, Plumlee believed O'Neill divulged confidential information to Dewey; yet in written findings of fact, the state court found no such confidential information was divulged, and that finding is supported by the record. Plumlee also believed Allison lied to him about accepting a position with the District Attorney and conspired with the District Attorney to destroy exculpatory evidence. Again, the state court found no such dishonesty or conspiracy, and that finding is supported by the record. Finally, Plumlee believed Gregory conspired with the District Attorney to hide a lost bail order. The state court found the lost bail order resulted from miscommunication, not from conspiracy, and that finding is supported by the record. Assuming that clearly-established federal law actually set forth the rule that an "ir-

the U.S. Supreme Court precedent, our court, or other circuit courts.

None of the three U.S. Supreme Court cases cited by the majority—*Cronic*, *Entsminger v. Iowa*, 386 U.S. 748 (1967), and *Anders v. California*, 386 U.S. 738 (1967)—recognize the "irreconcilable conflict" doctrine, nor do they support the majority's "objectively reasonable belief" rule. Indeed, *Cronic* emphasized that effective assistance of counsel is not measured by the amount of time counsel has to prepare, or the level of counsel's experience, but instead by his actual performance during the representation. 466 U.S. at 661-62. Tellingly, the Court stated: "If counsel is a reasonably effective advocate, he meets constitutional standards *irrespective of his client's evaluation of his performance*." *Id.* at 659 n.21 (emphasis added).

*Entsminger* and *Anders* are also inapposite. *Entsminger* overturned the state court's affirmance of the defendant's appeal where his counsel, believing the appeal to be without merit, failed to file the full record from the trial court, and the state supreme court then affirmed using only a skeletal record. 386 U.S. at 749-50. The Court held such process denied the defendant the benefit of an appeal on the full record, and by such action the court denied "all hope of any adequate and effective appeal at all." *Id.* at 752 (internal alterations omitted). Similarly, *Anders* disapproved of a state court procedure which allowed a defendant's counsel to withdraw from representation and abandon the defendant's appeal if the counsel concluded the appeal had no merit. 386 U.S. at 741-42. Those

reconcilable conflict" exists when the defendant has an "objectively reasonable belief" that his counsel cannot effectively represent him, how then could the Nevada Supreme Court's decision be an unreasonable application of that rule when none of the alleged conflicts between Plumlee and the Public Defender actually occurred?

two latter cases have nothing to do with an "irreconcilable conflict" between a defendant and his counsel.[21]

---

[21]The majority's expansion of the "irreconcilable conflict" rule is also inconsistent with the general rules for claims of ineffective assistance of counsel and conflicts of interest. To obtain relief for ineffective assistance of counsel, a petitioner must prove that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Court emphasized the necessity of the prejudice element, observing that "[t]he purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. Such a purpose would not be served were the petitioner able to obtain a reversal of his conviction due to harmless deficiencies in counsel's performance.

Further, a petitioner is entitled to a new trial under the "conflict of interest" doctrine where the petitioner establishes that a conflict of interest adversely affected counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 172 (2002). Similar to the *Strickland* rule, proof only that counsel had a potential conflict of interest is insufficient to provide relief; instead, the petitioner must show the conflict had an adverse effect on counsel's performance. *Id.* This too serves the core purpose of the Sixth Amendment guarantee of counsel by ensuring effective representation; if counsel still provided effective representation in the face of a potential conflict but without adverse effect, then no relief is warranted.

Yet under the majority's rule, all the defendant must show to obtain a new trial under the "irreconcilable conflict" doctrine is that he claims he has an "objectively reasonable belief" (which can be based solely on the defendant's own subjective suspicions, uncorroborated—indeed contradicted—by all other evidence adduced) that his appointed counsel could not effectively represent him. Majority op. at 17383, 17398. The majority's rule requires no showing that counsel did not provide adequate or effective representation; instead, the rule allows a defendant a new trial even where the defendant refused to cooperate with counsel solely on the basis of the defendant's belief that counsel could not effectively represent him. *See* Majority op. at 17401 ("A defendant simply cannot be expected to cooperate with attorneys he reasonably believes are working behind his back to undermine his defense."). Such a rule would *not* serve the core purpose of the Sixth Amendment, because it does not ensure effective representation; its only concern is whether the defendant himself claims he has an "objectively reasonable belief" that counsel can provide effective representation.

Further, the circuit court cases cited by the majority involve "irreconcilable conflicts" based upon specific, objective evidence of a conflict with counsel—conflicts not caused by the defendant—which would diminish the effectiveness of counsel's representation. *See*, *e.g.*, *United States v. Moore*, 159 F.3d 1154, 1159 (9th Cir. 1998) (in a direct appeal case, holding an "irreconcilable conflict" existed where counsel failed to communicate important information to the defendant, failed to investigate the case or prepare for trial, and where the defendant threatened to sue counsel for malpractice and the defendant felt physically threatened by counsel); *United States v. Mullen*, 32 F.3d 891, 893, 897 (4th Cir. 1994) (in a direct appeal case, holding an "irreconcilable conflict" existed where counsel would not permit the defendant to see any of the discovery materials, refused to answer the defendant's questions, and used "a tone of voice emulating force and threats" toward the defendant); *Smith v. Lockhart*, 923 F.2d 1314, 1317-18 (8th Cir. 1991) (in a pre-AEDPA habeas case, holding an "irreconcilable conflict" existed where the petitioner was a named plaintiff in a federal class action suit, and counsel was a named defendant in the same suit); *Wilson v. Mintzes*, 761 F.2d 275, 281-82 (6th Cir. 1985) (in a pre-AEDPA habeas case, holding an "irreconcilable conflict" existed where counsel attempted to withdraw from the case in mid-trial in front of the jury, and then refused to cross-examine a witness when his motion to withdraw was denied); *United States v. Williams*, 594 F.2d 1258, 1260 (9th Cir. 1979) (in a direct appeal case, holding an "irreconcilable conflict" existed in an attorney-client relationship described as "a stormy one with quarrels, bad language, threats, and counter-threats."); *Brown v. Craven*, 424 F.2d 1166, 1169-70 (9th Cir. 1970) (in a pre-AEDPA habeas case, holding an "irreconcilable conflict" existed where severe disagreements erupted between the petitioner and counsel based on counsel's failure to interview witnesses or properly investigate the case, and

exacerbated by the trial court's failure to inquire into the extent of the conflict).[22]

Recognizing that Plumlee's "irreconcilable conflict" claim is based on coincidence and conjecture, the majority makes the remarkable suggestion that it does not matter whether Plumlee's suspicions about his Public Defender attorneys were "actually based on fact. We make no such contention. Rather, we conclude only that Plumlee's suspicions were objectively *reasonable*." Majority op. at 17403 (emphasis in original). Hence, if a petitioner has "objectively reasonable" suspicions, as found by this court on appeal from the district court's denial of a petition for a writ of habeas corpus, we should reverse the district court and remand for a grant of the petition.

I see two things wrong with the majority's statement. First, the majority's "objectively reasonable belief" rule converts the traditional burden of proof under AEDPA, which rests upon the petitioner, to one of a non-movant's successful defense of a motion for summary judgment. Rather than having to convince the court that his suspicions of betrayal by his attorneys were true, all the petitioner has to do is present *some* evidence to show he had *some* facts upon which he can claim his suspicions were "objectively reasonable." Here, the majority allows *some* "objectively reasonable" evidence to carry the day for Plumlee, regardless that the other evidence introduced controverted all of Plumlee's claims. The majority sets our standard of review upon its head — it is a 180-degree reversal of the traditional burden of proof.

Second, the majority's analysis eviscerates 28 U.S.C. § 2254(d). AEDPA does not give us the authority to determine anew whether Plumlee's tale of feelings of betrayal is

---

[22]It bears mention that all of the cases cited by the majority were either on direct review or were pre-AEDPA. Here, however, AEDPA's deferential standard of review applies in full force.

based on actual fact. That fact-finding task is allocated to the Nevada courts, which evaluated the witnesses and reached their own conclusion as to the merits of Plumlee's "irreconcilable conflict" claim. Our task—and our *only* task—is to determine whether the Nevada courts made an unreasonable determination of the facts in finding there had been no betrayal of Plumlee by his Public Defender attorneys, *see id.* § 2254(d)(2), or unreasonably applied clearly-established federal law in holding no "irreconcilable conflict" deprived Plumlee of his Sixth Amendment right to counsel, *see id.* § 2254(d)(1). It is the majority's arrogation of fact-finding power to this court, and its improper second-guessing of the Nevada Supreme Court's legal conclusion, that underlies the majority's erroneous holding. *See Bell v. Cone*, 535 U.S. 685, 693 (2002) (stating AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law.").

Indeed, the majority itself gives away its game in the last pages of their opinion. The majority states: "The dissent also mischaracterizes our opinion as suggesting that a defendant's beliefs alone entitle him to new counsel. We have said nothing of the kind. What entitled Plumlee to new counsel was not the fact of Plumlee's suspicions themselves (however reasonable) but the irreconcilable conflict these suspicions engendered." Majority op. at 17403.

But if Plumlee's suspicions were found to be objectively baseless, as found by the Nevada courts, how can they then validly engender irreconcilable conflicts? For example, if Plumlee's suspicions were that his Public Defender attorneys were secretly married to the prosecutors—a palpably false assertion—would those suspicions engender irreconcilable conflicts? And if the public defenders did *not* in fact betray Plumlee, what then, other than Plumlee's jailhouse fantasies, "engendered" the alleged irreconcilable conflicts?

Put another way, if there is no sound, how can it produce an echo?

Despite the majority's assertion that they "cannot imagine that the extraordinary circumstances present here . . . will often, if ever, be replicated," Majority op. at 17404, the majority's creation of a new and exceptionally broad Sixth Amendment rule bodes ill for our criminal justice system. According to the majority's opinion, where the petitioner has made claims of defense counsel disloyalty, a federal court must grant a writ of habeas corpus if the court finds some rational basis for such claims, regardless whether the state courts heard the same evidence and rejected it as untrustworthy or overcome by other evidence, and did so reasonably and within the confines of 28 U.S.C. § 2254(d)(1)-(2).

I have little doubt that the impact of such a rule, if left unchanged, will have serious repercussions. It will encourage criminal defendants to imagine a slew of conspiracies between their appointed counsel, the prosecution, or even the trial courts, and then raise those suspicions under the label "objectively reasonable belief"—no matter how baseless, uncorroborated, or contradicted by evidence—in motions to substitute, interruptions during trial, and of course, briefs on appeal. It will encourage defendants to engage in contumacious behavior toward appointed counsel in the hope counsel might respond in anger or even better, seek to withdraw. Once the defendant develops such a record (hopefully embellished by a motion to withdraw by frustrated counsel), it will not matter if the defendant loses at trial and on state appeal. He will still have a pair of dice to throw at the reasonable belief table in the Ninth Circuit.

## III.   Conclusion

Of course, under the majority's decision, the Nevada courts may retry Plumlee and seek a new conviction. Yet after thirteen years, memories fade, evidence grows cold, and wit-

nesses disappear. The majority releases Plumlee—thirteen years into his two life sentences without possibility of parole —by refusing to follow congressional command and by fashioning a new, unworkable rule which raises to constitutional dimensions a defendant's unfounded suspicions and refusal to cooperate with his appointed attorneys. I cannot agree with such an unsupported decision. Accordingly, with respect to my colleagues, but with the utmost regret for their misguided opinion, I dissent.