NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0011n.06

No. 10-1750

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

**Jan 03, 2013**

DEBORAH S. HUNT, Clerk

TORAN V. PETERSON,

        Petitioner-Appellant,

             v.

WILLIE O. SMITH, Warden,

        Respondent-Appellee.

On Appeal from the United
States District Court for the
Western District of Michigan

---

**Before:     GUY, SILER, and COOK, Circuit Judges.**

     **RALPH B. GUY, JR., Circuit Judge.**   Petitioner Toran Peterson, a Michigan prisoner, appeals from the denial of his pro se petition for writ of habeas corpus in which he sought to overturn his convictions for first-degree murder and possession of a firearm during the commission of a felony.  Through appointed counsel, petitioner raised four ineffective-assistance-of-counsel claims based on the failure of trial counsel to:  (1) impeach the eyewitness with certain prior inconsistent statements; (2) challenge the in-court identification by the eyewitness; (3) move to suppress evidence seized from a house owned by Peterson's mother; and (4) secure the attendance of a witness whom the prosecution had been unable to find.  Peterson was allowed to file a supplemental brief after the withdrawal of counsel to argue claims that he did not wish to abandon on appeal.  After careful review of the record,

we affirm the denial of the petition for habeas relief.[1]

## I.

Shortly before 10:00 p.m., on December 1, 1999, Tarek Al-Rifai was shot and killed as he was leaving work at the Citgo gas station and convenience store located at the intersection of Warren and Cadillac in Detroit, Michigan. Al-Rifai suffered four shotgun wounds at close range: two to an arm, one to the abdomen, and one to the back of the head close to the neck. Al-Rifai's coworker Hefer Obed witnessed the shooting from behind bullet-proof glass approximately ten feet away. Obed, testifying through an interpreter, identified Peterson as the shooter during the preliminary examination and the two-day jury trial.

Obed testified at trial that he was a citizen of Yemen, had lived in the United States for four years, and did not have a good command of the English language. On the day of the shooting, Obed and Al-Rifai, whom he knew only as "Tarek," were working together at the Citgo station. At approximately 8:00 p.m., Obed was stocking the walk-in coolers when he heard an argument. Obed came out of the cooler and stood watching for five or six minutes while Al-Rifai and petitioner argued and cursed at each other. Obed testified that he did not know why they were cursing or what the argument was about. Obed spoke to petitioner to

---

[1]Peterson's supplemental brief reasserted a number of claims, although he concedes that the claims asserted in Arguments IV(a), IV(f), and VI were not made in his habeas petition. We will not review these claims. Moreover, to the extent that Argument VI may be read to assert that an evidentiary hearing was necessary in the habeas proceeding, it was not error for the district court to review claims under § 2254(d)(1) based on the record before the state court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). Nor was any showing made that would support a request for an evidentiary hearing under § 2254(e)(2).

apologize and try to calm things down.  Petitioner did not say anything, but pushed a shelf of candy onto the floor and left.  Obed returned to work in the cooler.

Approximately 25 minutes later, at about 8:30 p.m., Obed saw that Peterson had returned in an old car he often drove that was probably a Caprice, a Lincoln, or a Cadillac. He stayed in the car for two or three minutes, but drove away when Obed went to the door to go out to talk to him.  Petitioner returned a second time at 9:00 or 9:20 p.m., but again drove away when Obed moved to go out to him.  Finally, at about 9:50 p.m., after Obed had taken over at the cash register and Al-Rifai was leaving work, petitioner approached on foot carrying a "long gun."[2]  Peterson had covered his head and part of his face.

As Al-Rifai pushed the door to go out, he was confronted by petitioner and backed up trying to pull the door closed to lock it.  Petitioner grabbed the door and, keeping it open with a foot, started firing and shouted "Motherf**r I told you."  Obed heard Al-Rifai say "he came back" and also heard a total of four or five shots.  Al-Rifai died inside the doorway, Peterson fled, and Obed called the police.  As is outlined in more detail below, Obed testified that he was certain of the shooter's identity because, although he did not know Peterson's name at the time, Peterson was a regular customer for more than a year with whom he had spoken on many occasions.

The evidence at trial established that Al-Rifai was mortally wounded and that, although the order of his injuries could not be determined, his head wound would have been

---

[2]The interpreter explained that one word in Obed's native tongue means both rifle and shotgun.

almost immediately fatal. Police collected one live and four spent Remington shotgun shells from the scene and observed two pools of blood near the front door. The investigation led police to a nearby home on Pennsylvania Street where Peterson resided. With the written consent of his mother, who owned the premises, police conducted a search that resulted in the seizure of a box of Remington shotgun shells bearing the same mark as the shotgun shells found at the scene. No clothing or papers belonging to petitioner were found, and the ammunition was found in plain view in a box on the kitchen floor. On December 12, 1999, having received information concerning Peterson's whereabouts, police apprehended him as he fled wearing a wig and lipstick.

At the conclusion of trial, the jury found Peterson guilty on both counts. The trial judge sentenced him to consecutive terms of life without parole for first-degree murder and two years for the felony-firearm conviction. The Michigan Court of Appeals affirmed defendant's convictions, and the Michigan Supreme Court denied leave to appeal. Peterson filed a motion for relief from judgment, which the trial court denied for failure to demonstrate good cause to excuse the failure to raise the claims on direct appeal as required by MCR 6.508(D)(3). Leave to appeal was denied by both the Michigan Court of Appeals and the Michigan Supreme Court for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D).

In January 2007, Peterson filed a timely pro se habeas petition asserting thirteen claims of error. The last four claims were dismissed at petitioner's request so he could

exhaust his state remedies (Claims 10-13). Adopting the magistrate judge's report and recommendation, the district court concluded that the first four claims of ineffective assistance of trial counsel not only were procedurally defaulted but also were without merit (Claims 1-4); that petitioner had not established the fifth claim that appellate counsel was ineffective for failing to raise the first four claims on direct appeal (Claim 5); and that the state court's rejection of the last four claims on the merits—including several claims of ineffective assistance of counsel, the denial of substitute counsel, and error in finding due diligence had been used in attempting to locate the missing witness—was neither contrary to, nor an unreasonable application of Supreme Court precedent (Claims 6-9). The district court denied the petition for habeas relief and entered judgment in favor of respondent. With the grant of a certificate of appealability, this appeal followed.

**II.**

We review a district court's decision to grant or deny a petition for writ of habeas corpus *de novo*. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which governs this case, the writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §

2254(d)(1) and (2).  AEDPA deference applies to claims adjudicated on the merits, even when the state court's decision is unaccompanied by any reasoning.  *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## A.       Impeachment of Eyewitness

Peterson, through counsel and in his supplemental brief, claims that trial counsel rendered ineffective assistance of counsel by failing to impeach the eyewitness with certain purported inconsistencies.  To establish ineffective assistance of counsel, *Strickland* requires a showing of both deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984).   The first prong requires a showing that "'counsel's representation fell below an objective standard of reasonableness' . . . [and] a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 688 and 689).  For claims adjudicated on the merits in state court, however, the "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id*. at 788.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so."  *Id*. (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Although petitioner presented his various failure-to-impeach claims to the state courts either on direct appeal or on collateral review, only one ground was raised on direct appeal and adjudicated on the merits by the state courts.  The other grounds asserted in the motion

for relief from judgment were rejected by the trial court, along with the claim of ineffective assistance of appellate counsel for failing to raise them earlier. Because the Michigan Supreme Court and Michigan Court of Appeals cited only to MCR 6.508(D) in denying leave to appeal from that decision, they are unexplained orders that did not necessarily invoke procedural default. *See Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc). Looking through to the last reasoned decision, however, the trial court relied on MCR 6.508(D)(3), which is recognized as an independent and adequate state ground for purposes of procedural default. *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005).

Without contesting the first three prongs of the test for procedural default, petitioner argued that the fourth prong was not met because he could show cause and prejudice excusing the default. Since evaluation of the cause—the alleged ineffective assistance of appellate counsel—would require consideration of the strength of the defaulted failure-to-impeach claims, we will address the merits first and consider the cause and prejudice standard only if necessary. *See Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009).

*Eyewitness Testimony.* Obed testified that Peterson was the man he saw arguing with Al-Rifai a few hours before the shooting and that he was 100% sure Peterson was the shooter. By way of foundation, Obed was asked if he had ever seen petitioner before the shooting and Obed said "yes" and "[s]everal times." Upon further questioning, Obed explained that he knew petitioner "a long time" and, when asked how long, answered: "I believe more than a year." As for how frequently he saw petitioner, Obed answered: "Not

every day. Every other day every week sometimes every third day sometimes." Obed agreed that he was "fairly familiar with the sight of Mr. Peterson," and said he had spoken to him as a customer but not in friendly conversation. Later, Obed described petitioner as an "ordinary regular customer."

Obed acknowledged that he could only see the shooter's face from the bridge of the nose to the forehead, but added that, except for black gloves and a mask, Peterson wore the same clothes as he had when arguing with Al-Rifai earlier. He said he recognized the shooter's voice as Peterson, and knew that the shooter was Peterson even though he wore a cap, pulled the jacket hood over his head, and had a mask covering half of his face. Obed explained that he heard Peterson curse during the earlier argument, saying "you Arab Motherf**r," and that he had heard Peterson say "Arab Motherf**r" many times. Petitioner claims that although defense counsel cross-examined Obed, his performance fell below an objective standard of reasonableness because he did not attempt to impeach Obed by asking about the following purported inconsistencies.

*Shooter's Appearance.* Obed's witness statement indicated that the shooter wore a "dark jacket with a hood," had a thin mustache, and wore a scarf on his face. Differences between that description and Obed's trial testimony—that the shooter wore a green leather jacket with a hood, a black T-shirt, and a mask (not a cloth) on his face—were minor and not necessarily inconsistent as a jacket can be both "dark" and "green." His witness statement did not mention that there were patches or designer names on the pockets, but Obed testified

that he believed he told the officer about it. Obed explained: "Yes I talk to [an officer] but he was not really understanding me I was not really understanding him." Obed also said he signed the witness statement without reading it. Further inquiry into the minor discrepancies in the description of the shooter's appearance would have been met with rehabilitation, including Obed's witness statement indicating that he knew the shooter even though he was wearing a hood and scarf because the shooter was a "regular customer" and had been in the store earlier that evening.

*Number of Visits and Make of Car.* Obed testified that Peterson came back not once but twice between the argument and the shooting, but the witness statement did not mention that Peterson came back twice. Omission of this information from the brief statement, which Obed said he did not read before signing, did not present strong evidence of impeachment or undermine Obed's identification of Peterson as the shooter. Peterson argues that defense counsel should have challenged Obed on how he could have recognized the car as Peterson's while describing it as an old Lincoln or Cadillac. Defense counsel did in fact ask him about the car and prompted Obed to repeat that he thought the car was probably a Caprice, a Lincoln, or a Cadillac.

*Statements During the Shooting.* Petitioner faults counsel for not attempting to impeach Obed with discrepancies in his accounts of precisely what the shooter said as he shot Al-Rifai. Obed's preliminary examination testimony was that the shooter shouted, "I tell you, Motherf**r," while his witness statement indicated only that the shooter said

"Motherf**r."  At trial, he said Peterson shouted, "Motherf**r I told you," which petitioner argues implied that the shooter had argued with him earlier.  These differences were minor, were more consistent than inconsistent, and this impeachment would not undermine Obed's express testimony that the shooter was, in fact, the same man who had argued with Al-Rifai a few hours earlier.

Focusing on the victim's statement, Peterson attacks Obed's recollection of what Al-Rifai said during the shooting.  At trial, Obed testified (through an interpreter):  "First shot he shot Tyrek.  Tyrek implied to him [sic], this guy came back."  The prosecutor clarified that the victim did not say the shooter's name, but "just said he came back."  Petitioner argues that this was inconsistent with Obed's testimony at the preliminary examination that the victim "didn't say anything, only told me help me."  Inquiry on this point could reasonably be expected to have invited Obed to explain more clearly what, if anything, the victim had said as he was being shot and reinforce Obed's own testimony that Peterson had come back to shoot Al-Rifai.

*Account of the Shooting.*  Finally, and relatedly, petitioner maintains that defense counsel should have impeached Obed with two details from his account of the shooting during the preliminary examination.  First, although Obed seemed to have said that the victim was both shot and struck with the rifle, he clarified later during the preliminary examination that the victim was shot but not hit with the rifle.  This confusion does not represent an inconsistency or provide a basis to undermine Obed's credibility.  Second, Obed testified at

the preliminary examination that the victim tried to catch the shooter and "do something with him," but was not able to, came back inside, and died. Petitioner insisted on direct appeal that this account was inconsistent with the medical evidence. However, as the state court explained, the medical evidence established only that one of the wounds would have been almost immediately fatal but could not determine the order in which the wounds were inflicted. The state court rejected this claim on the merits, emphasizing that the central issue was not how long the victim survived but whether petitioner was the person who committed this crime.

Under *Strickland*, trial counsel's performance must be judged on the facts of the case, viewed from counsel's perspective at the time, and recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. This is not a case like *Higgins* in which defense counsel's complete refusal to cross-examine the prosecution's key witness fell below an objective standard of reasonableness. *See Higgins v. Renico*, 470 F.3d 624, 632-33 (6th Cir. 2006). Here, petitioner has not demonstrated that the failure of trial counsel to attempt to impeach the eyewitness with minor inconsistencies, immaterial discrepancies, or details omitted from the initial statement to police fell outside the wide range of reasonable professional assistance. Nor has petitioner demonstrated that this impeachment could have sufficiently undermined Obed's credibility so as to create "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694. Moreover, petitioner

cannot overcome the further deference applicable to the one impeachment claim that was

adjudicated on the merits.

## B.     In-Court Identification

Peterson claims that trial counsel rendered ineffective assistance by failing to move

to suppress the in-court visual and voice identification of him as the shooter. The Michigan

Court of Appeals rejected this claim, explaining that defense counsel was not required to

make futile or useless motions and that petitioner failed to identify any basis on which the

eyewitness identification testimony could have been suppressed. This determination is

entitled to AEDPA deference.[3]

Petitioner argues that the eyewitness visual and voice identification testimony should

be approached with caution, relying on arguments presented in an amicus brief filed with the

Supreme Court in the now-decided case of *Perry v. New Hampshire*, 132 S. Ct. 716 (2012),

and research such as Perrachione & Wong, *Learning to Recognize Speakers of a Non-Native*

*Language*, 45 Neuropsychologia 1899, 1906-07 (2007). However, the Court in *Perry*

rejected the contention that due process requires pretrial inquiry into the reliability of all

suggestive eyewitness identifications and declined to extend such pretrial screening to cases

---

[3]To the extent that petitioner suggests that the failure to make a motion to exclude the identification evidence could not be objectively reasonable because counsel had "nothing to lose" by making the motion, the Supreme Court has specifically repudiated a "nothing to lose" standard for evaluating *Strickland* claims. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims.").

in which the suggestive circumstances were not arranged by law enforcement officers. *See* 132 S. Ct. at 723 n.4 (abrogating *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)).

The Supreme Court has adopted a two-step approach for determining whether to exclude eyewitness identification testimony as a violation of due process in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977). The court must first assess whether the identification was unnecessarily suggestive and then assess whether "under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Manson*, 432 U.S. at 107; *see Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).

Further, unless there is "a very substantial likelihood of irreparable misidentification," identification evidence "is for the jury to weigh." *Manson*, 432 U.S. at 116. The Court in *Manson* identified five factors to consider in determining whether a suggestive identification was nonetheless reliable: (1) the opportunity to view the suspect at the time of the crime; (2) the degree of attention at the time of observation; (3) the accuracy of the prior description of the suspect; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the length of time between the crime and the identification. *Id.* at 114; *see also Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007); *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992).

Here, as outlined previously, Obed had the opportunity to view the shooter from a distance of about ten feet, while protected behind bullet-proof glass, for as long as it took to

struggle over the door and discharge four shotgun rounds. Obed observed the shooter with a "heightened degree of attention, as compared with 'disinterested bystanders or casual observers.'" *United States v. Crozier*, 259 F.3d 503, 511 (6th Cir. 2001). Yet, he was not the victim or in danger himself. Obed's description was consistent with Peterson, and he did not waver or indicate uncertainty about the identity of the shooter. Rather, Obed affirmatively stated and consistently testified that he knew the shooter because he was a regular customer and had been in the store arguing with the victim earlier that evening. Petitioner cannot establish that failure to make a motion to exclude the eyewitness identification constituted ineffective assistance of counsel, much less than that the state court's rejection of this claim was objectively unreasonable.[4]

## C.    Missing Witness

One witness was not produced at trial—Kenneth Taylor, who gave a statement on the night of the shooting in which he said he saw two men flee from the area after the shooting.[5] Taylor's statement was not offered into evidence, and the prosecution moved to remove him

---

[4]Citation to *Reamer v. United States*, 229 F.2d 884 (6th Cir. 1956), does not provide support for this claim because it did not involve the admissibility of the voice identification testimony. Rather, this court reversed on sufficiency of the evidence grounds where an uncorroborated voice identification was the only evidence identifying the defendant as one of the bank robbers.

[5]Taylor's statement reported that he had heard gunshots from a nearby porch north of Warren Avenue, walked to Warren, and saw two men on the other side of Warren running east from the area of the Citgo station and then south away from him on Hurlburt. Taylor said he "didn't get a good look at the men" and gave the following descriptions: (1) the man with the "long gun" was a black male, 30-35, 6'1," 160 lbs., and was wearing a black hooded sweatshirt, dark blue 3/4 coat, and blue jeans; and (2) the other man was a black male 25, 5' 10" heavy set, was wearing a dark 3/4 coat and dark baseball cap, and was walking with a limp like he had hurt his right leg.

from its witness list. Defense counsel requested a favorable missing-witness instruction, and the prosecution made a proffer outside the presence of the jury outlining the unsuccessful efforts that had been made to locate Taylor both for the preliminary examination and for trial. Finding that reasonable efforts and due diligence had been undertaken to find Taylor, the trial judge denied the request for the instruction. Peterson argued on direct appeal not only that the trial court erred, but also that defense counsel was ineffective because he had failed to investigate Taylor's whereabouts himself. Both claims were rejected on the merits.

Petitioner claims counsel rendered ineffective assistance by failing to attempt to locate Taylor and ask him to testify. The proffer made by Sgt. Williams established the many attempts that were made to contact Taylor—including checking jails, hospitals, utility and phone companies, and the post office—and that Taylor had reportedly moved and left no forwarding address. Although Sgt. Williams conceded that he had not tried to call the car wash that was listed as Taylor's place of employment on his witness statement, there was no evidence that Taylor, who had reportedly moved and left no forwarding address, was still working at the car wash at the time of trial. Nor does the evidence show that Taylor was a promising witness whose whereabouts should have been investigated. *See Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992). Further, a decision not to search for Taylor was reasonable since his description from a distance of the fleeing man with the "long gun" was consistent with petitioner and did not suggest that it could lead to exculpatory evidence.

A separate claim asserted that the trial court erred in finding that due diligence had been exercised and rejecting the requested instruction. We agree with the district court that petitioner has not demonstrated a denial of due process because he cannot show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The state court also explained that "the prosecutor no longer has a duty to produce res gestae witnesses and may add or delete a witness at any time by leave of the court for good cause shown." Not only does the record support the state court's due-diligence determination, but the Sixth Amendment does not compel the government to produce all witnesses competent to testify. *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992). When viewed through the lens of AEDPA deference, these claims do not warrant habeas relief.

## D.     Motion to Suppress Evidence

The state courts rejected on the merits the claim that trial counsel was ineffective because he did not make a motion to suppress the ammunition seized during the search of a house where Peterson resided. The search was conducted without a warrant, but with the undisputed written consent of Peterson's mother, Janie Peterson, who owned that house and the house next door. The Michigan Court of Appeals reasoned that the record permitted a reasonable inference that petitioner's mother was authorized to give the uncontested written consent to search.

Consent is a well-recognized exception to the Fourth Amendment's warrant requirement. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). Police may obtain consent from one who has actual or apparent authority over the premises. *Id*. at 186. Peterson argues that his mother did not have actual authority to consent to the search because she had agreed that he could be the sole occupant and told Sgt. Williams as much.[6] As the district court recognized, however, actual authority may be established where consent is obtained from one with common access or control of the premises for most purposes. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974); *see also United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007). Moreover, apparent authority exists when "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (internal quotation marks and citation omitted); *see also United States v. Burcham*, 388 F. App'x 478, 482 (6th Cir. 2010).

The record evidence available to trial counsel supported a reasonable inference that Janie Peterson, the homeowner, had authority to consent to the search of the home. Though the initial police report stated that she resided in the home next door, it did not contest the officer's testimony that he met her at the home searched and that she described her son as an infrequent resident there. Nor did it contradict the officer's testimony that he found the ammunition in plain sight on the kitchen floor. Presented with this evidence, trial counsel

---

[6]A later affidavit by Janie Peterson stated that she owned the house and that she had a verbal agreement allowing petitioner to live at and be the only occupant of 5139 Pennsylvania.

reasonably attempted to disassociate Toran Peterson from his mother's home. And, thus, the state court did not unreasonably apply *Strickland* in rejecting this claim.

## E.    Additional Claims

After Obed's testimony was complete and during the testimony of the police evidence technician, Peterson interrupted the proceedings to voice complaints about his attorney and the jury was removed. Peterson complained that his attorney was not doing what he wanted him to and said he did not want counsel to represent him. Court was adjourned for the day to allow Peterson to consult with his attorney. The following morning, the trial judge heard Peterson's complaints, declined to order a mistrial, and advised him of the pitfalls of self-representation. Peterson said he wanted to represent himself until he learned that Obed could not be reached and had been told the day before that he had been excused. Peterson agreed to have counsel represent him, and counsel's motion to withdraw was denied.

### 1.    Recall of Obed

Peterson argues that he was denied his right to a fair trial and due process by trial counsel's failure to object when the trial court (incorrectly) determined that Obed had been excused. This ineffective-assistance-of-counsel claim was raised in the motion for relief from judgment and denied for failure to comply with MCR 6.508(D)(3). The district court found this claim was both procedurally defaulted and without merit.

Notwithstanding Peterson's insistence to the contrary, the record supports the trial judge's statement that Obed had been excused the day before Peterson asked to recall him

and that an unsuccessful attempt was made to contact him. As such, Peterson cannot show that counsel's failure to challenge the trial judge on that point fell below an objectively reasonable standard of conduct. Further, having already evaluated the avenues of impeachment Peterson wanted to pursue in the context of the failure-to-impeach claims, we conclude that Peterson has not demonstrated prejudice from the inability to further cross-examine Obed. Because this claim does not warrant habeas relief, we need not decide the question of procedural default.

Petitioner attempts to reframe this issue as a violation of his right to confrontation, but the legal basis for this distinct claim was not fairly presented to the state courts. *See Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004). Even if that were not the case, Peterson's inability to recross-examine Obed in an attempt to impeach him with the purported inconsistencies would not establish a denial of the right to confrontation. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (trial courts have wide discretion to limit cross-examination); *Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (explaining that when the extent of cross-examination is limited, we ask whether the jury nonetheless had enough information to assess the defense theory).

## 2.    Substitute Counsel

Peterson renews his clam that the trial court's failure to grant the motion for substitute counsel based on a complete breakdown of the attorney-client relationship denied him effective assistance of counsel. In particular, Peterson complained that counsel belittled him

and called him stupid, failed to make pretrial motions (including the suppression motions discussed earlier), and refused to make the objections he wanted or to ask the questions he wanted asked (including the impeachment of Obed). The state court rejected Peterson's claim that the trial court erred in refusing to grant a mistrial or allow appointed counsel to withdraw mid-trial.

The Sixth Amendment right to counsel does not guarantee "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 14 (1983). Although Peterson relies on a Ninth Circuit decision finding that being forced to proceed with appointed counsel despite the complete breakdown of the attorney-client relationship violated the right to counsel, the en banc court vacated that decision precisely because the state court decision denying new counsel was not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See Plumlee v. Masto*, 512 F.3d 1204 (9th Cir. 2008) (en banc), *rev'g Plumlee v. Sue del Papa*, 426 F.3d 1095 (9th Cir. 2005).

Peterson further argues that the trial court failed to make the inquiry this court would require of a district court considering a defendant's request for substitute counsel. *See United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). Not only does it appear that the trial court made sufficient inquiry, the failure to do so could not be the basis for relief under AEDPA because such inquiry is not required by clearly established Supreme Court precedent. *See Brooks v. Lafler*, 454 F. App'x 449, 452 (6th Cir. 2012) (per curiam) (finding requirement that court inquire into good cause was not clearly established Federal law);

*James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006) (reversing a grant of relief because the inquiry requirement was not clearly established Federal law). Of course, that would not preclude petitioner from seeking relief on the grounds that the refusal to appoint new counsel resulted in a denial of effective assistance of counsel at trial. *Brooks*, 454 F. App'x at 452 (relying on *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) ("those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts")). However, as the state court also concluded, Peterson has not shown that trial counsel rendered ineffective assistance of counsel. This claim does not warrant habeas relief.

## III.

The district court's judgment is **AFFIRMED** and the petition for habeas relief is **DENIED**.